Filed 8/27/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S210234 |
| v. | ) | |
| | ) | Ct.App. 3 C071065 |
| ZACKERY PRUNTY, | ) | |
| | ) | Sacramento County |
| Defendant and Appellant. | ) | Super. Ct. No. 10F07981 |
| _____ | ) | |

Penal Code section 186.22, also known as the Street Terrorism Enforcement and Prevention Act (the STEP Act or Act), was enacted in 1988 to combat a dramatic increase in gang-related crimes and violence. The Act imposes various punishments on individuals who commit gang-related crimes — including a sentencing enhancement on those who commit felonies "for the benefit of, at the direction of, or in association with *any criminal street gang*." (Pen. Code, § 186.22, subd. (b) (section 186.22(b)), italics added.)[1] A criminal street gang, in turn, is defined by the Act as any "ongoing organization, association, or group of three or more persons" that shares a common name or common identifying symbol; that has as one of its "primary activities" the commission of certain enumerated offenses; and "whose members individually or collectively" have

---

[1] All further unlabeled statutory references are to the Penal Code.

1

committed or attempted to commit certain predicate offenses. (§ 186.22, subd. (f) (section 186.22(f)).) To prove that a criminal street gang exists in accordance with these statutory provisions, the prosecution must demonstrate that the gang satisfies the separate elements of the STEP Act's definition and that the defendant sought to benefit that particular gang when committing the underlying felony.

This case asks us to decide what type of showing the prosecution must make when its theory of why a criminal street gang exists turns on the conduct of one or more gang subsets. In this case, the prosecution's theory was that defendant Zackery Prunty committed an assault to benefit the Sacramento-area Norteño street gang. The evidence showed that Prunty identified as a Norteño; that he claimed membership in a particular Norteño subset, the Detroit Boulevard Norteños; and that Prunty uttered gang slurs and invoked "Norte" when shooting a perceived rival gang member at a Sacramento shopping center. To show that Prunty's crime qualified for a sentence enhancement under the STEP Act, the prosecution's gang expert testified about the Sacramento-area Norteño gang's general existence and origins, its use of shared signs, symbols, colors, and names, its primary activities, and the predicate activities of two local neighborhood subsets. The expert did not, however, offer any specific testimony contending that these subsets' activities connected them to one another or to the Sacramento Norteño gang in general. We must determine whether this is enough to satisfy the STEP Act's "criminal street gang" definition.

We conclude that the STEP Act requires the prosecution to introduce evidence showing an associational or organizational connection that unites members of a putative criminal street gang. The prosecution has significant discretion in how it proves this associational or organizational connection to exist; we offer some illustrative examples below of strategies prosecutors may pursue. Yet when the prosecution seeks to prove the street gang enhancement by showing

2

a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets. In this case, the prosecution did not introduce sufficient evidence showing a connection among the subsets it alleged comprised a criminal street gang, so Prunty was not eligible for a sentence enhancement under the STEP Act. We must therefore reverse the Court of Appeal's contrary judgment.

## I. BACKGROUND

On the evening of November 26, 2010, 21-year-old Gustavo Manzo went to a fast-food restaurant in a Sacramento shopping plaza, accompanied by his girlfriend and her two younger brothers. Manzo was wearing a Los Angeles Dodgers baseball cap, which is attire typically associated with Sureño street gangs. As Manzo and his companions approached the restaurant, defendant Prunty and Emilio Chacon confronted them. Prunty described himself as a "Norte" and a "Northerner," and specifically identified as a member of the "Detroit Boulevard . . . set." His companion Chacon was a member of the Varrio Franklin Boulevard Norteños, based out of South Sacramento.

Prunty, who was wearing a red jacket, approached Manzo, asked him where he was from, and said, "fuck a Skrap, 916." "Skrap" or "Scrap" are derogatory terms Norteño gang members use for Sureño gang members, while "916" is the Sacramento area code. In response, Manzo called Prunty and Chacon "Buster" — a derogatory term for Norteños. The confrontation escalated, with Prunty throwing gang signs and saying "this is Norte, fuck a Skrap, 916," and Manzo and his girlfriend telling Prunty to "keep walking" and calling Prunty and Chacon "Busters." Eventually Manzo advanced on Prunty, and Prunty drew a gun and fired six times. The bullets struck and injured Manzo and his girlfriend's 10-year-old brother.

3

Prunty was charged with the attempted murder of Manzo and assault with a firearm for shooting the 10-year-old victim.  (§§ 664/192, subd. (a), 254, subd. (a)(2).)  The prosecution alleged that each of these offenses was committed "for the benefit of, at the direction of, or in association with [a] criminal street gang," and was thus subject to a sentence enhancement under the STEP Act.  (§ 186.22(b)(1).)  To prove that Prunty qualified for the enhancement, the prosecution introduced evidence from a gang expert, Detective John Sample, a veteran officer with the Sacramento Police Department.  Sample — who interviewed Prunty shortly after his arrest — testified that Prunty admitted that he is a "Northerner," or a Norteño gang member, and described his membership in the Detroit Boulevard Norteño "set."  Sample also testified that Prunty's clothing and hairstyle, his previous contacts with law enforcement, and his possession of Norteño graffiti, images, clothing, and other paraphernalia were consistent with Norteño gang membership.

Sample's further testimony related to the prosecution's theory that Prunty assaulted Manzo with the intent to benefit the Norteños.  Sample testified that the Norteños are "a Hispanic street gang active in Sacramento and throughout California" with about 1,500 local members.  Sample explained that Sacramento-area Norteños are not associated with any particular "turf" but are instead "all over Sacramento" with "a lot of subsets based on different neighborhoods."  Sample described the "primary activities" of Sacramento-area Norteños as unlawful homicide, attempted murder, assault, firearms offenses, and weapons violations.  Sample also testified that Norteños share common names, signs, and symbols, including names derived from "the north, Norteños, [and] northerner," the letter N, the number 14, and the color red.  The "Norteños' enemy," moreover, is the Sureño street gang, whose members identify with the color blue, the letters S and M, and the number 13.  Both the Norteños and the Sureños "originated out of the

4

California prison systems" in the 1960s and 1970s. The Sureños are associated with the Mexican Mafia prison gang, while the Norteños have a "street gang association" with the Nuestra Familia, or NF, prison gang. Finally, Sample described various other aspects of Norteño and Sureño gang culture generally, including the appearance of gang graffiti and gang signs as well as each gang's use of common derogatory statements about its rivals.

The prosecution relied on Sample not only to describe Norteños and Sureños in general terms, but also to prove that the Sacramento-area Norteños were indeed the ones who committed the two or more predicate offenses that an "organization, association, or group" must commit to coincide with the STEP Act's definition of a criminal street gang. (§ 186.22(f).) First, Sample described a 2007 confrontation between two Norteño gang subsets, the Varrio Gardenland Norteños and the Del Paso Heights Norteños, that led to two Varrio Gardenland members' convictions for a variety of offenses, including murder and attempted murder. Second, Sample testified about a 2010 incident in which members of the Varrio Centro Norteños shot at a former Norteño gang member. Besides Sample's testimony that these gang subsets referred to themselves as Norteños, the prosecution did not introduce specific evidence showing these subsets identified with a larger Norteño group. Nor did Sample testify that the Norteño subsets that committed the predicate offenses shared a connection with each other, or with any other Norteño-identified subset.

The jury acquitted Prunty of attempted murder but convicted him of the lesser included offense of attempted voluntary manslaughter. (§§ 664/192, subd. (a).) It also convicted him of assault with a firearm (§ 245, subd. (a)(2)) and found true the allegations that Prunty personally used a firearm (former § 12022.5, subd. (a)) and committed the offenses at the direction of, in association with, or for

the benefit of a criminal street gang (§ 186.22(b)). The trial court sentenced Prunty to an aggregate term of 32 years in prison.

On appeal, Prunty claimed that the prosecution failed to introduce sufficient evidence to prove that he committed the offenses for the benefit of a criminal street gang, as that term is defined in section 186.22(f). Prunty challenged the prosecution's theory that the relevant "ongoing organization, association, or group" (§ 186.22(f)) in this case was the "criminal street gang known as the Norteños" in general. Prunty emphasized the prosecution's use of crimes committed by various Norteño subsets to prove the existence of a single Norteño organization. He argued that this improperly conflated multiple separate street gangs into a single Norteño gang without evidence of "collaborative activities or collective organizational structure" to warrant treating those subsets as a single entity. According to Prunty, the prosecution's theory did not satisfy the STEP Act's "criminal street gang" definition.

In support of this argument, Prunty relied on *People v. Williams* (2008) 167 Cal.App.4th 983 (*Williams*), which addressed the identification of the relevant group under the STEP Act. (*Williams*, at p. 987.) In that case, the court held that where a gang contains various subsets, the gang cannot be used as the relevant group — and evidence of various subsets' activities cannot be used to prove the gang's existence — absent proof of "some sort of collaborative activities or collective organizational structure." (*Id.* at p. 988.) The court in *Williams* also held that more than "a shared ideology or philosophy, or a name that contains the same word, must be shown before multiple units can be treated as a whole when determining whether a group constitutes a criminal street gang." (*Ibid.*)

The Court of Appeal here rejected the reasoning in *Williams*, which it held improperly "add[ed] an element to the [STEP Act] that the Legislature did not put there." Instead, the Court of Appeal reasoned, evidence of "a common name

6

(Norteño) and common identifying signs and symbols (the color red, the letter N, the number 14)" coupled with the existence of "a common enemy (the Sureños)" is sufficient to show that a criminal street gang exists. The Court of Appeal relied on other decisions that did not explicitly require proof of a collaborative connection to demonstrate that "the Norteños" are a "criminal street gang within the meaning of section 186.22." Based on this interpretation of the STEP Act's requirements for showing a criminal street gang to exist, the Court of Appeal sustained Prunty's sentence enhancement under section 186.22.

We granted Prunty's petition for review to address the type of evidence required to support the prosecution's theory that various alleged gang subsets constitute a single "criminal street gang" under section 186.22(f).

## II. DISCUSSION

Although this case encompasses the sufficiency of the evidence to sustain Prunty's sentence enhancement, the core question in this case is statutory. At the heart of this case is the meaning of the phrase "criminal street gang" — a term in colloquial usage that is nonetheless given a specific meaning in the STEP Act. The STEP Act defines a "criminal street gang" as an "ongoing organization, association, or group." (§ 186.22(f).) That "group" must have "three or more persons," and its "primary activities" must consist of certain crimes. (*Ibid.*) The same "group" must also have "a common name or common identifying sign or symbol," and its members must be proven to have engaged in a "pattern of criminal activity" by committing predicate offenses. (*Ibid.*) This case requires us to decide what it means to constitute an "organization, association, or group," as well as how the STEP Act's various elements of the "criminal street gang" definition affect the types of theories about a criminal street gang's existence that the prosecution may offer. These are questions of statutory interpretation that we must consider de novo. (*Imperial Merchant Services, Inc. v. Hunt* (2009) 47

7

Cal.4th 381, 387.) We apply a deferential standard of review when evaluating —
as we do below (at pp. 23-29, *post*) — whether the evidence in this case was
sufficient to satisfy the STEP Act's definition. (See *People v. Zamudio* (2008) 43
Cal.4th 327, 357.)

For the reasons set forth below, we conclude that where the prosecution's
case positing the existence of a single "criminal street gang" for purposes of
section 186.22(f) turns on the existence and conduct of one or more gang subsets,
then the prosecution must show some associational or organizational connection
uniting those subsets. That connection may take the form of evidence of
collaboration or organization, or the sharing of material information among the
subsets of a larger group. Alternatively, it may be shown that the subsets are part
of the same loosely hierarchical organization, even if the subsets themselves do
not communicate or work together. And in other cases, the prosecution may show
that various subset members exhibit behavior showing their self-identification
with a larger group, thereby allowing those subsets to be treated as a single
organization.[2]

Whatever theory the prosecution chooses to demonstrate that a relationship
exists, the evidence must show that it is the same "group" that meets the definition
of section 186.22(f) — i.e., that the group committed the predicate offenses and

---

[2]    The rule we describe in this case applies to all STEP Act cases where the
prosecution's theory of why a criminal street gang exists turns on the conduct of
one or more gang subsets, not simply to those in which the prosecution alleges the
existence of "a broader umbrella gang." (Conc. & dis. opn. of Corrigan, J., *post*,
at p. 1.) The STEP Act does not require prosecutors to prove that an "umbrella"
gang exists; indeed, that term appears nowhere in the statute. And in any event,
we granted review in this case to address the showing prosecutors must make
when attempting to show that "multiple subsets of the Norteños may be treated as
a whole" under section 186.22(f). That question is not premised upon the
existence of a broader "umbrella" group.

engaged in criminal primary activities — and that the defendant sought to benefit under section 186.22(b).**3**  But it is not enough, as the Court of Appeal in this case held, that the group simply shares a common name, common identifying symbols, and a common enemy.  Nor is it permissible for the prosecution to introduce evidence of different subsets' conduct to satisfy the primary activities and predicate offense requirements without demonstrating that those subsets are somehow connected to each other or another larger group.

The STEP Act's language strongly suggests that, to be part of a "criminal street gang," subsets must share some associational or organizational connection with the larger group, whether arising from individual members' routine collaboration with each other or otherwise.  Our task in construing the Act, of course, is to ascertain and effectuate the intended legislative purpose.  (*People v. Gardeley* (1996) 14 Cal.4th 605, 621.)  The text of the statute is our starting point, and "generally provide[s] the most reliable indicator" of the Legislature's intended purpose.  (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 871.)  Here, the words the Legislature chose to describe the collection of people who constitute a "criminal street gang" — "organization, association, or group, whether formal or informal" — contemplate some kind of relationship, or degree of "togetherness," uniting those individuals.  Dictionary definitions of "association" emphasize the existence

---

**3**     Prunty received a sentence enhancement under section 186.22(b), which applies to felonies committed "for the benefit of, at the direction of, or in association with any criminal street gang."  The STEP Act also imposes a substantive penalty on "[a]ny person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity."  (§ 186.22, subd. (a).)  Both subsections use the same "criminal street gang" definition that is set forth in section 186.22(f).  While this case requires us to directly address only section 186.22(b)'s sentence enhancement, we see no reason that the definition of "criminal street gang" would vary in the context of an active participation prosecution.

9

of some connection among members, i.e., "[a]n organized body of people who have an interest, activity, or purpose in common," (American Heritage Dict. (4th ed. 2000) p. 109) or "an organization of persons having a common interest" (Merriam Webster's Collegiate Dict. (11th ed. 2003) p. 75). The same is true of definitions of "organization," which describe, for example, "[a] group of persons organized for a particular purpose . . ." (American Heritage Dict., *supra*, at p. 1239), and persons comprising a "functional structure" (Merriam Webster's Collegiate Dict., *supra*, at p. 874). Both terms envision some measure of connection among members, such as unity of purpose, shared activities, or other manifestations of a common relationship.

The same is true of the meaning associated with "group," as used in this context. Though the term "group," standing alone, could conceivably encompass broader collections of people — the definitions of the term include "[a]n assemblage of persons or objects gathered or located together," "[a] number of individuals or things considered together because of similarities" (American Heritage Dict., *supra*, at p. 776), and "a number of individuals assembled together or having some unifying relationship" (Merriam Webster's Collegiate Dict., *supra*, at p. 552) — its use in the STEP Act in conjunction with "organization" and "association" suggests a meaning generally similar to — and at least no broader than — those terms. (See *People v. Arias* (2008) 45 Cal.4th 169, 180.) Broadly consistent with this approach, moreover, is the *noscitur a sociis* canon of construction — implying that a word literally "is known by its associates." (*Orey v. Superior Court* (2013) 213 Cal.App.4th 1241, 1252.) From this perspective, the term "group" is best interpreted in light of its semantic relationship to the terms "association" and "organization" — terms that, together with "group," convey the kind of shared venture that is the subject of the statute. Even if it were conceivable that the term "group" could be understood in different ways in this

10

particular context, we must stop short of construing it so expansively that we render the other terms "unnecessary or redundant[] or . . . markedly dissimilar to the other items in the list." (*People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 307.)

To determine the evidentiary showing necessary to demonstrate that alleged subsets are part of a single overarching organization, we must assign coherent meaning to "organization, association, or group" — bearing in mind that these terms are modified by the STEP Act's reference to how the shared venture in question can be "formal or informal." (§ 186.22(f).) This qualification suggests that the prosecution need not show that the relationship between subsets and a larger organization resembles, for example, the stereotypical organized crime syndicate's hierarchical, tightly organized framework. (See *United States v. Orena* (2d Cir. 1994) 32 F.3d 704, 708 (*Orena*).) Such formal groups may often reflect well-defined membership criteria, a discernible hierarchy, predictable meeting schedules and locations, fixed membership groups, and codified rules and order. Informal groups, by contrast, will rarely if ever display these characteristics. They need not exhibit an identifiable hierarchy; their membership composition may be fluid; the boundaries of their "turf" may be porous; and their methods of communication may be variable. But, they must still be united by something in common beyond pure happenstance. Evidence — even indirect evidence — showing collaboration among subset members, long-term relationships among members of different subsets, use of the same "turf," behavior demonstrating a shared identity with one another or with a larger organization, and similar proof will show that individual subsets are part of a larger group, without running afoul of the Legislature's decision to embrace even groups based on informal relationships within the scope of the Act.

11

What can be gleaned from the legislative history also sheds light on the Act's scope, and accords with our conclusion. Some organizational or associational connection, whether formal or informal, must exist among subsets of a "criminal street gang." In setting forth its findings and declarations concerning the STEP Act, the Legislature identified "the organized nature of street gangs" as posing a unique threat to public safety. (§ 186.21.) The Legislature described this "organized nature," and the accompanying "patterns of criminal gang activity," as "the chief source of terror created by street gangs" that the Legislature sought to eradicate. (*Ibid.*) These statements indicate that the Legislature found criminals acting in association — however loose — to pose a more serious threat to public safety than other criminals. The clear purpose of the Act is to target these criminal groups in particular. (*People v. Albillar* (2010) 51 Cal.4th 47, 55 (*Albillar*) ["Crimes committed by gang members . . . pose dangers to the public and difficulties for law enforcement not generally present when a crime is committed by someone with no gang affiliation"].) At the same time, the Legislature evidently wanted the STEP Act to apply to groups with looser associations than traditional criminal conspiracies. Criminal conspiracies require proof of various elements — such as a specific agreement and the commission of an overt act — that the STEP Act does not require. The Legislature apparently intended that the STEP Act would reach significantly beyond such traditional forms of organized criminal activity. This background suggests that we read the STEP Act as the Legislature's attempt to strike a reasonable balance in targeting criminal street gang activity: to sweep more broadly than traditional conspiracy law, but still to focus on the particular dangers stemming from informally organized criminal activity.

The Act's structure also sheds light on the need for an informal connection uniting subsets into a single group. In particular, the structure helps make clear

12

what sort of evidence will *not* be sufficient, standing alone, to show that a single group exists. The Act indicates that a group must be united by more than shared colors, names, and other symbols. Section 186.22(f) provides that a "criminal street gang" must satisfy several requirements, including the separate requirements that the members comprise an "ongoing organization, association, or group" and share a "common name or common identifying sign or symbol." Because the STEP Act separately identifies a "common name or common identifying sign or symbol" as a hallmark of a criminal street gang, we must read the phrase "ongoing organization, association, or group" as a distinct requirement. (*Ibid.*) To do otherwise would effectively — and improperly — read the latter phrase out of the Act entirely. (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 280.) The STEP Act's "organization, association, or group" requirement must consequently be satisfied by evidence that goes beyond proof that three or more persons share a "common name or common identifying sign or symbol." (§ 186.22(f).)

Nor does the Act's text or structure support the conclusion that a common enemy (or similar evidence of a loose common ideology) is enough to demonstrate that various subsets are part of a single criminal street gang. The Act's use of the phrase "organization, association, or group" suggests that subsets of a criminal street gang must be united by their activities, not simply by their viewpoints. (§ 186.22(f).) Those words suggest a degree of physical togetherness or the engagement in common activities, rather than an isolated matter on which members of different subsets share the same viewpoint. Those terms also suggest that shared ideology is a poor proxy for whether a group in fact exists. For instance, all animal lovers are not members of the American Society for the Prevention of Cruelty to Animals (ASPCA), even though all members of the ASPCA might love animals. They may share a common ideology, but only the latter have taken active steps to come together and associate with one another. We

13

must know more about any given collection of animal lovers — their location and their activities, for instance — to determine whether they are a true "organization, association, or group."  Though the formality of an organization may diminish in the criminal street gang context, the need for evidence of activities rather than shared viewpoint is no different.  Members of various subsets may share similar viewpoints — for instance, opposition to Sureño gang members — and may also wear similar colors or use common identifying symbols.  But the STEP Act makes clear that the use of common colors and symbols does not demonstrate the existence of a unified group.  Evidence of a common viewpoint also fails to show that subsets have any other relationship that unites them.

How prosecutors could prove the existence of such relationships is also illuminated by the Act's text and structure.  The prosecution's evidence must permit the jury to infer that the "gang" that the defendant sought to benefit, and the "gang" that the prosecution proves to exist, are one and the same.  The Act imposes a sentence enhancement on "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with *any criminal street gang*."  (§ 186.22(b)(1), italics added.)  That gang is defined in section 186.22(f), which provides that the gang must consist of "three or more persons" who have as one of their "primary activities the commission of" certain enumerated criminal acts; who share "a common name or common identifying sign or symbol"; and "whose members individually or collectively engage in or have engaged in a pattern of criminal activity."  Thus, the Act requires that the gang the defendant sought to benefit, the individuals that the prosecution claims constitute an "organization, association, or group," and the group whose actions the prosecution alleges satisfy the "primary activities" and predicate offense requirements of section 186.22(f), must be one and the same.

14

Indeed, as the STEP Act defines a criminal street gang as one whose members engage in a pattern of criminal gang activity, it is axiomatic that those who commit the predicate acts must belong to the same gang that the defendant acts to benefit. In light of this "sameness" requirement, the prosecution need not demonstrate the precise scope of an alleged gang, but it must allow the jury to reasonably infer that the "criminal street gang" the defendant sought to benefit — or which directed or associated with the defendant — included the "group" that committed the primary activities and predicate offenses.

In contrast, the Court of Appeal's conclusion that "smaller neighborhood subsets" may be treated as a single "criminal street gang" based simply on evidence that the subsets share a "common name . . . [or] common identifying signs and symbols" is not consistent with the STEP Act's requirements. The Act's text, purpose, and structure all support a construction of section 186.22(f) that requires the prosecution to show that a "criminal street gang" exhibits some level of informal association among its members. And the Act itself provides limits on how the prosecution can make such a showing — i.e., with proof transcending the mere existence of a common name (or other identifying symbols) used by various individuals, or a common ideology that appears to be present among otherwise disconnected people. The prosecution has the discretion to choose its theory of how a particular gang exhibits an associational or organizational connection. Irrespective of that choice, the evidence must permit the jury to infer a relationship among the group's members.[4] Below, we offer some illustrative examples of how

---

[4] We disagree with the Court of Appeal — and with the Attorney General — that our interpretation of section 186.22(f) adds "an element to the statute that the Legislature did not put there." Our holding is rooted in the text of section 186.22(f) and is substantiated by other evidence of the Legislature's intent to target only those groups bearing some indicia of organized criminal activity. This

*(Footnote continued on next page.)*

15

the prosecution can show a criminal street gang to exist, particularly when the theory advanced is that various alleged gang subsets should in fact be treated as a single entity for purposes of the STEP Act.

### A. Examples of Organizational and Associational Connections

In describing some of the circumstances that may show an organizational or associational connection, we are mindful that groups involved in illicit activity may exhibit starkly different degrees of formal organization. In certain cases, gangs may constitute loosely coupled, amorphous organizations that routinely operate covertly. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506-507; see also *People v. Ortega* (2006) 145 Cal.App.4th 1344, 1357 (*Ortega*).) Prosecutors need not — and in some cases, could not — show that these groups resemble formally structured, hierarchical enterprises such as businesses or professional associations. We are also cognizant that the STEP Act's definition of "criminal street gang" embraces "formal or informal" associations. (§ 186.22(f).) Finally, we do not intend to place limits on the theories that the prosecution may advance in attempting to show that various neighborhood-based groups in fact constitute a single "criminal street gang" within the Act's meaning. We offer the following as illustrative examples for the Courts of Appeal and trial courts, and not to circumscribe the ability prosecutors have to show the necessary connection in other ways.

---

*(Footnote continued from previous page.)*

interpretation is consistent with other cases construing the STEP Act, in which we have likewise focused on the statutory language, the legislative purpose, and the likely consequences of a particular interpretation. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323-324; *People v. Castenada* (2000) 23 Cal.4th 743, 751-752; *People v. Loeun* (1997) 17 Cal.4th 1, 18 (*Loeun*); *People v. Gardeley*, *supra*, 14 Cal.4th at pp. 620-622.)

The most straightforward cases might involve subsets connected through formal ways, such as shared bylaws or organizational arrangements. Evidence could be presented, for instance, that such subsets are part of a loose approximation of a hierarchy. Even if the gang subsets do not have a formal relationship or interact with one another — indeed, even if they are unaware of one another's activities — the subsets may still be part of the same organization if they are controlled by the same locus or hub. For example, Norteño gang subsets may be treated as a single organization if each subset contains a "shot caller" who "answer[s] to a higher authority" in the Norteño chain of command. (*Williams*, *supra*, 167 Cal.App.4th at p. 988; see also *People v. Tran* (2011) 51 Cal.4th 1040, 1044.)

Subsets may also be linked together as a single "criminal street gang" if their independent activities benefit the same (presumably higher ranking) individual or group. An example would be various Norteño subset gangs that share a cut of drug sale proceeds with the same members of the Nuestra Familia prison gang. More indirect evidence may also show that distinct gang subsets are organizationally linked. For instance, proof that different Norteño subsets are governed by the same "bylaws" may suggest that they function — however informally — within a single hierarchical gang. (*In re Jose P.*, *supra*, 106 Cal.App.4th at p. 463.) Alternatively, evidence that two seemingly unrelated Norteño cliques routinely act to protect the same territory or "turf" could suggest that they are part of a larger association. Similarly, proof that several gang subsets conduct independent, but harmonious, criminal operations within a discrete geographical area may show that they are part of a single entity whose bosses have divided up a larger territory. (See *People v. Robinson* (2012) 208 Cal.App.4th 232, 239 [describing testimony that "several Project Trojans gang subsets"

17

conduct "independent narcotics sales operations" within a "13-block area of North Richmond"].)

In other situations, formal structure or hierarchy may not be present, but the facts may suggest the existence of behavior reflecting such a degree of collaboration, unity of purpose, and shared activity to support a fact finder's reasonable conclusion that a single organization, association, or group is present. One possibility in such situations is for prosecutors to show that members of the various subsets collaborate to accomplish shared goals. For instance, the evidence may show that members of different subsets have "work[ed] in concert to commit a crime," (*Ortega*, *supra*, 145 Cal.App.4th at p. 1357),[5] or that members have strategized, formally or informally, to carry out their activities. Ultimately, this type of evidence will permit the inference that the subsets have some sort of informal relationship. This evidence need not be direct, and it need not show frequent communication or a hierarchical relationship among the members who communicate. For instance, evidence that two Norteño subsets have professed or exhibited loyalty to one another would be sufficient to show that the two subsets collaborate or cooperate. (*In re Jose P.*, *supra*, 106 Cal.App.4th at p. 463.) So too would evidence of fluid or shared membership among the subset or affiliate gangs,

**5**     The Court of Appeal in this case relied on *Ortega*, *supra*, 145 Cal.App.4th 1344, and *In re Jose P.* (2003) 106 Cal.App.4th 458. Neither case purported to require proof of an organizational or associational connection to show the existence of a single criminal street gang. We disapprove *People v. Ortega*, *supra*, 145 Cal.App.4th 1344 and *In re Jose P.*, *supra*, 106 Cal.App.4th 458, to the extent they are inconsistent with our holding here. Nevertheless, we note that the prosecution's evidence in those cases was likely sufficient to satisfy the framework we lay out here. We refer to that evidence here for illustrative purposes.

18

or evidence that a "liaison" works to coordinate relations between the groups. (*Williams*, *supra*, 167 Cal.App.4th at p. 988.)

Even evidence of more informal associations, such as proof that members of two gang subsets "hang out together" and "back up each other," can help demonstrate that the subsets' members have exchanged strategic information or otherwise taken part in the kinds of common activities that imply the existence of a genuinely shared venture. (*People v. Louie* (2012) 203 Cal.App.4th 388, 394; *In re I.M.* (2005) 125 Cal.App.4th 1195, 1201.) This type of evidence routinely appears in gang enhancement cases. (See *People v. Hairston* (2009) 174 Cal.App.4th 231, 237, fn. 4 [describing testimony that "it was very common for members of different gang subsets to intermingle and hang out together"].) In general, evidence that shows subset members have communicated, worked together, or share a relationship (however formal or informal) will permit the jury to infer that the subsets should be treated as a single street gang.

Where groups lack identifiable hierarchy or similar signs of organization, the prosecution could also demonstrate that various alleged gang subsets manifest specific behavior that is relevant to whether they are part of a single "organization, association, or group." They may, for example, mutually acknowledge one another as part of that same organization, and evidence may be presented that the organization in question tends to operate in decentralized fashion and in the relevant geographic area. This approach is premised on the fact that members of loosely organized criminal associations may not always evince the amount of openly observable collaborative activity that one might ordinarily perceive in entities dedicated to pursuing lawful activities. But this reality can be reconciled with the STEP Act's provisions requiring the presence of a unitary "organization, association, or group" through evidence of group members' behavior suggesting shared identification with a single group, along with evidence of the alleged

19

group's characteristics. For instance, evidence that two members of different neighborhood subsets have engaged in activities suggesting that they identify one another as belonging to the same criminal street gang could be relevant to showing that the subsets form a single group. Such evidence, coupled together with appropriate evidence that a gang exists, that it operates within a particular geographic area, and that it conducts its activities through subsets or in another decentralized fashion, could permit the inference that the different subsets are members of a single group.

But there are some limits on the boundaries of an identity-based theory. The evidence must demonstrate that an organizational or associational connection exists in fact, not merely that a local subset has represented itself as an affiliate of what the prosecution asserts is a larger organization. (See conc. & dis. opn. of Corrigan, J., *post*, at p. 3.) Although evidence of self-identification with the larger organization may be relevant, the central question remains whether the groups in fact constitute the same "criminal street gang." In making the required showing, moreover, the prosecution must do more than simply present evidence that various alleged gang subsets are found within the same broad geographic area. For instance, that the various alleged gang subsets in this case were located "all over Sacramento" does not show that the subsets constituted a single criminal street gang. The prosecution must introduce evidence of the alleged subsets' activities, showing a shared identity that warrants treating them as a single group. Such evidence could come in the form of proof that a certain Norteño subset retaliates against a Sureño gang for affronts that gang has committed against other Norteño subsets. Behavior of this kind could suggest that members of the Norteño subset consider themselves to be part of a larger association. Or, the prosecution could introduce evidence showing that different subsets require their members to perform the same initiation activities. Evidence of this common behavior may be

20

some evidence that members identify themselves as belonging to the same gang. The key is for the prosecution to present evidence supporting a fact finder's reasonable conclusion that multiple subsets are acting as a single "organization, association, or group." (§186.22(f).) Evidence of self-identification must refer to the particular activities of subsets, and must permit the jury to reasonably conclude that the various subsets are associated with each other because of their shared connection with a certain group. And where, as in this case, the alleged perpetrators of the predicate crimes under section 186.22(f) are members of particular subsets, the behavior of those subsets' members must connect them to the gang the defendant sought to benefit.

Because criminal street gangs may vary in size, scope, and degree of informality, the circumstances of a given case may lead the prosecution to seek different ways of establishing that a particular gang meets the requirements of section 186.22(f). For example, when a defendant commits a crime to benefit a particular subset, and the prosecution can show that the subset in question satisfies the primary activities and predicate offense requirements, there will be no need to link together the activities of various alleged cliques; nor is there likely to be uncertainty about what the relevant "criminal street gang" is. Indeed, our cases suggest that many gang-related prosecutions involve the conduct of discrete criminal street gangs and do not turn on the relationship between alleged gang subsets. (See, e.g., *Albillar*, *supra*, 51 Cal.4th at p. 420; *Loeun*, *supra*, 17 Cal.4th at p. 6.)

Regardless of the theory the prosecution chooses, there is no requirement that the subset gangs have peaceably coexisted for them to constitute a single organization. Prunty claims that "subset Norteño gangs were often in fierce rivalry with one another — not working together for any common Norteño purpose." He asserts that this evidence prohibits the inference that the alleged

21

subsets were part of a single group. We disagree that evidence of conflict among gangs will defeat other evidence of an organizational or associational connection. Just as proof of "internecine warfare" among various factions does not defeat proof that a single criminal "enterprise" exists (*Orena*, *supra*, 32 F.3d at p. 710), evidence that subset gangs have periodically been at odds does not necessarily preclude treating those gangs collectively under the STEP Act — particularly since, as discussed above, the STEP Act applies more broadly than traditional criminal enterprise law.

What section 186.22(b) *does* require is that the "criminal street gang" the prosecution proves to exist be the same gang that the defendant sought to benefit (or which directed or associated with the defendant in connection with the crime). (At pp. 14-15, *ante*.) This "sameness" requirement means that the prosecution must show that the group the defendant acted to benefit, the group that committed the predicate offenses, and the group whose primary activities are introduced, is one and the same. This showing is critical in a case, like this one, where the prosecution's theory of a criminal street gang turns on the activities of two or more alleged gang subsets. In such a case, the evidence the prosecution introduces to show an organizational or associational connection must be sufficient to show that the "criminal street gang" at issue includes those particular subsets. For instance, suppose that the prosecution's theory of a case is that a defendant committed a felony to benefit the Los Angeles Sureño street gang. The prosecution alleges that the Sureño gang operates through subsets in the Los Angeles area, and it introduces evidence that two subsets — the Sur Santos Pride subset and the Vario Locos Trece subset — share the same territory. But to prove the predicate offense element of the STEP Act, the prosecution introduces evidence of crimes committed by two other alleged Sureño subsets, the Southside and Loma Baker subsets. Absent more evidence, it is impossible for the jury to infer that the

22

Sureño gang the defendant wished to benefit includes any of these alleged subsets. Nor could the jury permissibly infer from this evidence, on its own, that the Southside and Loma Baker subsets have any relationship with the Sur Santos Pride and Vario Locos Trece subsets. One way the prosecution could solve this problem, for example, would be to introduce evidence of a relationship among all four alleged subsets — a relationship that would permit the inference that they constitute a single Sureño organization. Or the prosecution could show some connection among the Southside and Loma Baker subsets and the Sureño gang the defendant intended to benefit. The prosecution need not establish the metes and bounds of that Los Angeles Sureño gang, or show an organizational or associational connection that unites all alleged gang subsets in the area. But it must have a theory of the "criminal street gang" at issue that shows the same group to satisfy all elements of the STEP Act.

B. *Sufficiency of the Evidence in This Case*

Reviewing the evidence in light of the framework we have set forth, we find that the prosecution failed to prove the existence of a single "criminal street gang" within the STEP Act's meaning that fit the prosecution's theory of why the gang enhancement applied in this case. The critical shortcoming in the prosecution's evidence was the lack of an associational or organizational connection between the two alleged Norteño subsets that committed the requisite predicate offenses, and the larger Norteño gang that Prunty allegedly assaulted Manzo to benefit. The evidence was not sufficient to permit the jury to infer that the organization, association, or group at issue included the subsets that committed the predicate offenses.

23

The prosecution's theory underlying the gang enhancement charge was that Prunty assaulted Manzo to benefit the Sacramento-area Norteños.**6**  This decision dictated the type of evidence the prosecution needed to introduce showing that the Sacramento-area Norteños satisfy section 186.22(f):  the prosecution needed to show that the same group engaged in illicit primary activities, and committed the predicate offenses.  The prosecution's evidence as to the former requirement was likely sufficient; Sample testified that "the Norteños" in the area engage in various criminal practices, including homicide, assault, and firearms offenses.

But where the prosecution's evidence fell short is with respect to the predicate offenses.  Sample referred to two offenses involving three alleged Norteño subsets:  a confrontation between the Varrio Gardenland Norteños and members of the Del Paso Heights Norteños that escalated into a fatal shooting; and a shooting by members of the Varrio Centro Norteños that resulted in the death of a "drop-out Norteño."  Although Sample characterized these groups as Norteños, he otherwise provided no evidence that could connect these groups to one another, or to an overarching Sacramento-area Norteño criminal street gang.  Sample did not describe any evidence tending to show collaboration, association, direct

---

**6**      At the same time, the prosecution presented evidence demonstrating that Prunty identified as a member of a particular alleged Norteño subset — the Detroit Boulevard Norteños.  The ample evidence that Prunty claimed membership in the Detroit Boulevard Norteños was likely sufficient for the jury to infer that Prunty intended to benefit that group; Prunty affirmatively declared that he "claim[ed] Norte" and that Detroit Boulevard was his "set."  This evidence could likely support the conclusion that Prunty intended to benefit the Detroit Boulevard Norteños.  But the prosecution did not so argue, and in any event did not introduce any evidence attempting to connect the Detroit Boulevard group to any of the other alleged subsets in the case.  Thus, the possibility that the jury could have believed the Detroit Boulevard subset to be the putative "criminal street gang" at issue does not change our conclusion.

24

contact, or any other sort of relationship among any of the subsets he described. None of his testimony indicated that any of the alleged subsets had shared information, defended the same turf, had members commonly present in the same vicinity, or otherwise behaved in a manner that permitted the inference of an associational or organizational connection among the subsets. Contrary to the minority opinions' suggestions, we should neither speculate to fill evidentiary gaps (conc. & dis. opn. of Corrigan, J., *post*, at p. 5), nor defer to the jury's findings when there is no reasonable basis to do so (conc. & dis opn. of Cantil-Sakauye, C.J., *post*, at pp. 4-6; see also pp. 27-29, *post*).

Nor did Sample's testimony demonstrate that the subsets that committed the predicate offenses, or any of their members, self-identified as members of the larger Norteño association that the defendant sought to benefit. Although there was ample evidence that Prunty self-identified as both a member of the Detroit Boulevard Norteños and the larger umbrella Norteño gang, and that he collaborated with a member of another subset to commit his present offenses, the prosecution presented no evidence that the members of the Varrio Gardenland and Varrio Centro Norteños self-identified as part of the umbrella Norteño gang. Sample testified about the Sacramento Norteños' existence and their presence "all over Sacramento" with "subsets based on different neighborhoods." But Sample never addressed the Norteño gang's relationship to any of the subsets at issue. And in describing the two alleged subsets that committed the predicate offenses, Sample offered no evidence that their members behaved in a manner that conveyed their identification with the larger association that Prunty sought to benefit. Instead, Sample simply described the subsets by name, characterized

25

them as Norteños, and testified as to the alleged predicate offenses.[7] He offered no additional information about their behavior or practices that could reasonably lead the jury to conclude they shared an identity with a larger group. The jury was consequently left with no way to connect the subsets that committed the predicate offenses to the larger Norteño group the prosecution claimed Prunty acted to benefit.

Sample did testify that "Norteño street gangs" are "associate[d]" with the Nuestra Familia prison gang. While such evidence might permit the inference that the various alleged gang subsets share a common origin, it does not indicate whether the specific subsets involved in committing the predicate offenses have any ongoing relationship — the kind of relationship that amounts to being part of the same group — with the entity the defendant sought to benefit. Sample did not testify, for instance, about any relationship between Nuestra Familia shot callers and any of the Sacramento-area Norteño subsets. While he did reference "written" and "unwritten" rules that govern "what gang members can and can't do," he did not explain whether these rules applied to the particular subsets in this case.

Certain evidence relevant to the gang enhancement inquiry is indeed found in some of Sample's additional testimony. But it was nonetheless insufficient to show the existence of a single "criminal street gang" encompassing both the group Prunty sought to benefit and the specific subsets whose members committed the predicate offenses. Sample testified that Norteño gang subsets use the same name, symbols, and colors; use similar gang signs, tattoos, graffiti, and other methods of

_____

[7]     To the contrary, Sample's testimony described conflict among the Norteño subsets he described. While this testimony would not prevent a jury from concluding that the subsets are associated (at pp. 21-22, *ante*), it suggests that the fact finder could not place too much weight on the mere fact that the subsets called themselves "Norteños."

26

communication; wear similar clothing and colors; and are united in their opposition to Sureño gang members. But this evidence tends to show that the alleged subsets use common symbols or common identifying colors and thereby fulfill the element of section 186.22(f) requiring such common characteristics; it does not show that the subsets are united together or with a larger group as a single "organization, association, or group," as we have explained above. (At pp. 12-14, *ante*.) In any event, none of Sample's testimony addressed whether the subsets whose members committed the predicate offenses were among those that exhibited even these common characteristics. That Prunty claimed gang membership — including membership in the Norteño gang the prosecution alleged he acted to benefit when assaulting Manzo — is also evident from some of Sample's testimony. But we have previously noted that evidence of gang membership is "neither necessary nor sufficient to establish any element of the gang enhancement." (*People v. Valdez* (2012) 55 Cal.4th 82, 132.) In this context, evidence that Prunty claimed gang membership bears on what his intent may have been in committing the assault. But the evidence provided no way for the jury to determine that the Norteños were an "organization, association, or group" under the STEP Act's meaning — or, critically, that the alleged subsets that committed the predicate offenses were part of that group.

To be sure, the prosecution did introduce some evidence of collaboration between members of different gang subsets — namely, Prunty and his companion Emilio Chacon. Sample testified that Chacon was a member of the Varrio Franklin Boulevard Norteños. Prunty met up with Chacon earlier on the day of the shooting, and the two planned to steal a bottle of liquor from a supermarket in the shopping center where the shooting took place. Chacon was also at least tangentially involved in the confrontation with Manzo. While this evidence shows collaboration, it does not establish the necessary connection to the Norteño subsets

that committed the predicate offenses. Sample did not testify as to any relationship between the Varrio Franklin Boulevard subset and either of the two alleged subsets that committed the predicate offenses. And while the relationship between Chacon and Prunty is some evidence of a larger Sacramento-area Norteño group, the prosecution's case still lacks evidence connecting the Varrio Gardenland and Varrio Centro cliques to that group. The absence of this necessary connection precludes application of the gang enhancement here.

It is also true that Sample testified extensively about "the Norteños" and described them as a criminal street gang. He testified as to the group's size, its geographic location, and its general practices. While this evidence was surely relevant to the gang enhancement's application, Sample's characterization of a group as a "criminal street gang" is insufficient absent some reason to believe that conclusion was based on the evidence necessary to show a single criminal street gang to exist as the STEP Act defines it. The dissent claims that Sample's testimony provided just such a reason. (Conc. & dis. opn. of Cantil-Sakauye, C.J., *post*, at pp. 6-7.) Yet Sample's statements describing "the Norteños" as "a Hispanic street gang" are — for purposes of showing a criminal street gang to exist (*id.* at pp. 4-5) — purely conclusory and essentially of no use to the fact finder. (See *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117-1118.) Sample did not describe any facts tending to show an organizational or associational connection among the Norteño subsets he described, nor did he articulate any reasons for concluding that all such subsets are part of a single criminal street gang. Nor did Sample describe the material he relied on in reaching his conclusions — implicit or otherwise (conc. & dis. opn. of Cantil-Sakauye, C.J., *post*, at pp. 4-5) — about the Varrio Gardenland and Varrio Centro subsets and their relationship to one another or a larger group. Thus, his testimony on this point had no value to the jury. (See *People v. Lawley* (2002) 27

28

Cal.4th 102, 132.) The jury could not have relied on Sample's testimony to find that the prosecution established the existence of a criminal street gang here.

Although we find the evidence here insufficient to qualify Prunty for the gang enhancement, nothing in this opinion reflects any skepticism regarding the general factual question of whether the Norteños exist — a question that amicus curiae Pacific Juvenile Defendant Center asks that we resolve in the negative. We have previously upheld gang enhancements where the "criminal street gang" in question was a geographically dispersed group. (See *People v. Brookfield* (2009) 47 Cal.4th 583, 587.) While we find the evidence here insufficient, nothing in our opinion reflects doubt that prosecutors can prove the existence of such a criminal street gang when the evidence supports such a conclusion. The only evidentiary question before us is whether the prosecution — consistent with the theory it advanced regarding what constituted the relevant "criminal street gang" — presented sufficient proof in this case.

III. DISPOSITION

We conclude that section 186.22(f)'s definition of a "criminal street gang" — and in particular its requirement of an "organization, association, or group" — calls for evidence that an organizational or associational connection unites the "group" members. When, as here, the prosecution relies on the conduct of subsets to show a criminal street gang's existence, the prosecution must show a connection among those subsets, and also that the gang those subsets comprise is the same gang the defendant sought to benefit. Because the decision below does not accord with this standard, we reverse the Court of Appeal's judgment as to defendant Prunty's sentence and remand for further proceedings not inconsistent with this opinion.

CUÉLLAR, J.

WE CONCUR:

WERDEGAR, J.
LIU, J.
KRUGER, J.

30

**CONCURRING AND DISSENTING OPINION BY
CANTIL-SAKAUYE, C. J.**


This case was a classic gang crime. It was a confrontation between two Sacramento Norteños and a Sacramento Sureño in a shopping plaza parking lot in an area claimed by the Norteños, which escalated from the exchange of Norteños and Sureños gang slurs into a shooting that seriously injured multiple individuals, including an innocent young child. Surely, this is the *very* type of gang crime at which the STEP Act was aimed. (Pen. Code, § 186.21;[1] *People v. Rodriguez* (2012) 55 Cal.4th 1125, 1129; *People v. Albillar* (2010) 51 Cal.4th 47, 55.) Not surprisingly, the jury found defendant committed the underlying crimes "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b).)

When a reviewing court considers a claim that the evidence is insufficient to support a verdict, it considers the entire record in the light most favorable to the prosecution and *presumes in support of the verdict the existence of every fact the jury could reasonably have deduced from the evidence.* (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104.) Applying this standard here, I disagree with my

_____

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

1

colleagues who conclude that there is insufficient evidence in the record to support the jury's true finding on the gang enhancement. The circumstances of the crime and the unchallenged testimony of the prosecution's expert, Detective Sample, sufficiently established the necessary links between defendant, Emilio Chacon, the predicate crime gang members and the Sacramento Norteños.

Evidence was admitted at trial in this case that defendant identified himself, in an interview with law enforcement, as a "Norte" or a "Northerner" who "claimed" the Detroit Boulevard neighborhood of Sacramento as his "set." He told officers that he started claiming the Northerners when he was in seventh grade after some gang-related trouble in school. He explained that he claimed Norte because all of his family, on his maternal side, were Northerners. Prior to the events of November 20, 2010, defendant had been involved in a number of confrontations with Sacramento Sureños gang members, including one incident involving an exchange of gunfire with individuals wearing clothing associated with the Sureños. Defendant possessed Norteño graffiti, images, clothing, and other paraphernalia consistent with Norteño gang membership, some relating to the Varrio Diamonds neighborhood set of the Norteños.

On the evening of November 20, 2010, defendant was in the company of Emilio Chacon. Chacon was a Sacramento Norteño with the Varrio Franklin Boulevard subset. Chacon's body was tattooed with symbols and the number 14, associated with the Norteños. Defendant and Chacon had traveled from their own southern area of Sacramento to an area near a Panda Express restaurant in midtown Sacramento intending to go into the nearby Safeway store to steal a bottle of brandy. The neighborhood they were in was territory claimed by the Varrio Centro Norteños and the Southside Park Norteños. Defendant was wearing clothing in the red color typically associated with the Norteños.

2

In the parking lot, defendant and Chacon encountered and confronted Gustavo Manzo, who was wearing attire typically associated with the Sureños and who was in fact a validated Sureños gang member. Both defendant and Chacon called out terms and phrases such as "Norte," "Northerner," "this is Norte," "fuck a Skrap, 916 [Sacramento's regional telephone area code]," and "fucking Skrap, 916." Defendant did not yell "Detroit Boulevard" or any variant and Chacon did not yell "Varrio Franklin Boulevard" or any variant. They both claimed the Norteños gang that connected them together, challenging a perceived Sureño who was in territory claimed by the Sacramento Norteños. In response, Manzo and his girlfriend called defendant and Chacon "Busters," a general derogatory term for Norteños used by Sureños. The confrontation escalated with defendant throwing gang signs and exchanging with Manzo further derogatory gang slurs. It culminated in defendant drawing a gun and shooting Manzo and Manzo's girlfriend's 10-year-old brother.

Under these circumstances, the prosecution reasonably sought to prove the existence of a Sacramento Norteños criminal street gang and that defendant's crimes were committed for the benefit of that gang.

I agree with Justice Corrigan that the specific and narrow issue presented in this case is what evidence is necessary to prove a criminal street gang enhancement when the prosecution proffers evidence that a defendant committed a felony to benefit a street gang that operates through subsets, but the predicate offenses are committed by members of a subset of such gang. (Conc. opn. of Corrigan, J., at p. 1.) I disagree, however, that the evidence admitted in this case, notably unchallenged by the defense at trial, was insufficient.

For the purpose of proving the existence of a Sacramento Norteños criminal street gang, the prosecution called Sacramento Police Department Detective John Sample as its expert witness on Hispanic gangs. After Sample testified to his

3

extensive training, experience and previous testimony as an expert witness on Hispanic street gangs and gang culture, the defense declined voir dire and the trial court accepted him as a qualified expert witness on the subject.

Sample testified that "the Norteños" are "*a* Hispanic street gang active in Sacramento and throughout California" with approximately 1,500 local members in Sacramento. (Italics added.) Sample testified that the Sacramento Norteños do not have a general "turf." Rather, the members are "all over Sacramento, from north and south." He explained, however, that there are "subsets based on different neighborhoods," which the members will "claim." Asked to give the jury an idea of their common identifying names, signs or symbols, Sample testified that because Norteño was Spanish for north, the Norteños use "derivatives of the north, Norteños, northerner." They also use the letter N. And because N is the 14th letter of the alphabet, they also use the number 14 or derivatives of it such as one and four dots or the Roman numeral XIV. According to Sample, the color typically associated with Norteños is the color red. The primary enemies of the Norteños are Sureños gang members. Sample testified that the Sureños are "*a* street gang *just like* the Norteños." (Italics added.) They identify themselves with the color blue, the letters S and M, and the number 13 with its derivatives. Sample described the "primary activities" of the Sacramento Norteños as unlawful homicide, attempted murder, assault, firearms offenses, and weapons violations.

The prosecution then asked Sample if he would agree that the Norteños in the Sacramento area engage in a pattern of criminal activity. He responded, "*Yes*." (Italics added.) Asked to give a couple of examples of "*that* criminal activity" (italics added), i.e., the predicate crimes of the Sacramento Norteños, Sample described his investigation of a homicide that occurred on August 19, 2007, in which Varrio Gardenland Norteños "subset" gang members shot three gang members from the Del Paso Heights Norteños "subset," killing one of them.

4

Sample agreed that the incident was an example of "in-house" "Norteño on Norteño" crime. Sample also described a 2010 incident in which several members of the Varrio Centro Norteños "subset" (in whose territory defendant's crimes occurred) shot at a "drop-out Norteño gang member." Sample's expert testimony, given in response to the question of whether "the Norteños in the Sacramento area" engage in a pattern of criminal activity, implicitly, but clearly, linked the Varrio Gardenland Norteños subset and the Varrio Centro Norteños subset involved in the described predicate crime incidents to the Sacramento Norteños. His testimony expressed his opinion that the predicate crimes were committed by and on behalf of the Sacramento Norteños. Implicitly, the testimony also expressed his opinion that the predicate crime subsets considered themselves to be and acted as part of the Sacramento Norteños.

Sample went on to describe how a shooting such as the one in this case would be intended to benefit the Norteños by enhancing their reputation for violence and ruthlessness.

Sample was asked, during cross-examination, to explain the genesis of the north/south rivalry between the Norteños and Sureños gangs. In response, Sample testified that the two groups evolved from prison gangs active from at least the 1960s and 1970s. According to Sample, the Mexican Mafia was one of the strongest prison gangs. It would often victimize Latino inmates who were not part of the gang culture. Eventually, Latino inmates who were not part of the Mexican Mafia formed their own prison gang which they called the Nuestra Familia, which means "our family" in Spanish. Sample testified that the prison rivalry eventually "poured out into the streets." Outside prison, those who identified with Nuestra Familia called themselves Norteños and those who identified with the Mexican Mafia called themselves Sureños.

5

Viewing this record, as we must, in the light most favorable to the judgment (*People v. McCurdy, supra*, 59 Cal.4th at p. 1104; *People v. Rountree* (2013) 56 Cal.4th 823, 852-853), there is evidence that is reasonable, credible, and of solid value from which a rational trier of fact could find that the Sacramento Norteños is a criminal street gang. Indeed, the very case the majority cites for the deferential standard of review when evaluating the sufficiency of evidence (maj. opn., at p. 8, citing *People v. Zamudio* (2008) 43 Cal.4th 327) reminds us that "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient evidence to support" ' the jury's verdict." (*Id.*, at p. 357.) " 'We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Scott* (2011) 52 Cal.4th 452, 487.) " 'Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106.) "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (Evid. Code, § 805.) A witness testifying in the form of an opinion may state on direct examination the basis for his or her opinion and a court may in its discretion require that such a witness be examined before testifying regarding "the reasons for his opinion and the matter . . . upon which it is based" (Evid. Code, § 802), but any inadmissible material that forms the basis of the opinion testimony is not " 'independent proof' of any fact." (*People v. Gardeley* (1996) 14 Cal.4th 605, 619.) Correspondingly, the failure to testify to such basis is not a failure of "proof." Under these principles, Detective Sample's expert testimony, taken as a whole and in context, when viewed in conjunction with the evidence of the circumstances of the crime, including the collaboration of defendant and Chacon in traveling to another Norteños area of Sacramento, indeed the territory of one of the predicate crime subsets, with the criminal purpose of

6

shoplifting and then mutually confronting Manzo with Norteños taunts in an apparent attempt to protect Norteños turf, is sufficient to support the jury's verdict finding true the gang enhancement under section 186.22, subdivision (b).

The majority cites *People v. Lawley* (2002) 27 Cal.4th 102 in support of its conclusion that Sample's characterization of the Sacramento Norteños as a criminal street gang, without a description of further facts or reasoning, is of no value and constitutes insufficient evidence of that fact. (Maj. opn., at p. 28.) *Lawley* is not on point. In *Lawley*, this court rejected the defendant's contention that the trial court was required to appoint a third competency expert when two previously appointed experts came to opposite conclusions. (27 Cal.4th at pp. 131-132.) We found appointment of a third expert in such situation unnecessary, noting that the trial court was able to assess the weight and persuasiveness of the experts' findings and conclusions without resort to further expert opinion. In that context, we noted the chief value of an expert's testimony lies in the material and reasoning on which his or her opinion rests, and observed that expert opinion evidence is really an argument to the court. (*Id.*, at p. 132.) *Lawley* does not stand for the proposition that expert opinion evidence must be rejected absent a full explanation of the facts and reasoning on which it is based, i.e., that it cannot itself constitute substantial evidence. Rather, it up to the trier of fact to give it the weight that it deserves. (*People v. Brown* (2014) 59 Cal.4th 86, 100-101; see *People v. Jones* (2012) 54 Cal.4th 1, 59.) *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117-1118, cited by the majority (maj. opn., at p. 28), is also distinguishable. In *Jennings*, the trial court granted the defendants' motion to strike an expert witness's testimony regarding causation as being without foundation and the issue before the reviewing court was whether the trial court erred in concluding the testimony was inadmissible. (*Id.*, at p. 1112.) The issue is different when an expert's relevant

7

and qualified testimony is admitted without objection or challenge, as was the case with Sample's opinion testimony. Under the circumstances here, it is inconsistent with the applicable standard of review for a reviewing court, in the absence of patent falsity, inherent improbability, or other reason to question its validity, to decide that Sample's testimony is incredible or without value.

For the same reason, Sample's testimony implicitly establishing that the subset gang members who committed the predicate crimes considered themselves to be part of the Sacramento Norteños may not be rejected on appeal. Sample's testimony was not unreasonable, incredible, or lacking in solid value simply because it expressed his expert opinion that the predicate crime gang "subsets" acted as part of the Sacramento Norteños. (Evid. Code, § 805.) Indeed, there is nothing in the record before us that suggests Sample's opinion lacked a sound basis given his broad experience and personal knowledge of Hispanic gangs in the Sacramento area, including the predicate offense Sacramento Norteños subsets.

It is well settled that proof may be by both direct and circumstantial evidence. (*People v. Jones* (2013) 57 Cal.4th 899, 961 [circumstantial evidence may be sufficient to prove guilt beyond a reasonable doubt]; *People v. Morrow* (1882) 60 Cal. 142, 144-145 [circumstantial evidence may be as strong as direct evidence in proving guilt]; see *People v. Livingston* (2012) 53 Cal.4th 1145, 1167 [the law regarding proof by direct and circumstantial evidence is correctly stated in CALCRIM No. 223 & CALJIC No. 2.00].) Here there was such evidence supporting a reasonable inference that the predicate crime gang subsets were part of the Sacramento Norteños and that the Sacramento Norteños is a criminal street

8

gang. The courts in *People v. Ortega* (2006) 145 Cal.App.4th 1344 and *In re Jose P.* (2003) 106 Cal.App.4th 458 upheld jury verdicts finding the Norteños to be a criminal street gang. We should do the same.

**CANTIL-SAKAUYE, C. J.**


**I CONCUR:**

**CHIN, J.**

**CONCURRING AND DISSENTING OPINION BY CORRIGAN, J.**

I concur in the judgment and write separately to clarify the scope of our decision. The issue we address is a narrow one. It arises only when the prosecution seeks to prove a street gang enhancement by showing the defendant committed a felony to benefit a broader umbrella gang, but seeks to prove the requisite pattern of criminal gang activity with evidence of felonies committed by members of subsets to the umbrella gang. Our decision is limited to that factual scenario.

To prove the street gang enhancement, the prosecution must prove that defendant committed the underlying crime "for the benefit of, at the direction of, or in association with any criminal street gang . . . ." (Pen. Code,[1] § 186.22, subd. (b).) It must also prove the following:

1. The defendant acted with the specific intent to promote, further, or assist criminal conduct by members of an identifiable group. As the majority notes, the group must be one that its members recognize as an ongoing entity with which they associate. (See maj. opn., *ante*, at p. 25.)

2. That group must be of a specific kind in order to satisfy the STEP Act's definition of a criminal street gang. The group may be formal or informal, but it

---

[1]      All statutory references will be to the Penal Code.

must be an ongoing association of three or more people who share a common name or identifying symbol. (§ 186.22, subd. (f).) The majority is correct that the mere sharing of a common name or symbol is insufficient, standing alone, to satisfy the statute. In addition, one of the primary activities of the group must be the commission of certain enumerated crimes and group members must engage in a pattern of criminal gang activity.

3. This pattern of criminal gang activity must be proven by evidence that a gang member or members committed two offenses as set out in the statute.[2] These acts are described as "predicate offenses." (*People v. Tran* (2011) 51 Cal.4th 1040, 1044.)

This case involves a specific kind of criminal street gang: an umbrella group allegedly operating through smaller subsets that may be independent from each other, but which associate and identify with the broader umbrella group. As the majority and the Chief Justice note, there is abundant evidence in this record that an entity known as the Norteños exists, operates in the Sacramento area, shares common symbols and the name "Norteño," and operates through smaller associated subsets. Likewise, there is substantial evidence that defendant

---

[2] The statute defines a pattern of criminal gang activity as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons . . . ." (§ 186.22, subd. (e).) "This language allows the prosecution the choice of proving the requisite 'pattern of criminal gang activity' by evidence of 'two or more' predicate offenses committed 'on separate occasions' *or* by evidence of such offenses committed 'by two or more persons' on the same occasion." (*People v. Loeun* (1997) 17 Cal.4th 1, 10; but see *People v. Zermeno* (1999) 21 Cal.4th 927, 930-933.)

2

associated with the larger Norteño gang, and intended to promote, further, or assist criminal conduct by its members.

To prove the required predicate offenses, the prosecution's gang expert, Sample, testified about crimes committed by specifically named groups: Varrio Gardenland Norteños and Varrio Centro Norteños. Sample made the conclusory statement that Varrio Gardenland and Varrio Centro were subsets of the umbrella group of Norteños. But he did not provide any testimony from which the jury could conclude that these smaller groups actually considered themselves part of the broader Norteño group, other than the sharing of the name and symbols. While the use of a common name or symbol is necessary, something more is required.

The evidence fell short only because Sample failed to testify the Varrio Centro Norteños and the Varrio Gardenland Norteños were *actually associated* with the broader Norteño umbrella group in that they *consider themselves* members of, not only their own subset, but of the larger group of Norteños as well. It is that final link alone that is missing here, and its absence undermines the verdict. [3]

The majority concludes that "the STEP Act requires the prosecution to introduce evidence showing an associational or organizational connection that unites members of a putative criminal street gang" (maj. opn., *ante*, at p. 2), and gives a series of examples (*id*. at pp. 16-23). The examples given include

---

[3] This lack of proof is somewhat understandable. The defense did not contest that the Norteños exist as an umbrella group that qualifies as a criminal street gang and operates through neighborhood subsets. Indeed, the defense theory was that defendant, as a Norteño member, was threatened by a Sureño member and acted in self-defense. Evidence of the link may have been readily available but not explicitly inquired about because the law was unclear in this regard.

evidence of "shared bylaws or organizational arrangements" (*id*. at p. 17), the existence of collaborative activity (*id*. at p. 18), or self-identification as part of a larger group (*id*. at pp. 19-20).

Contrary to the majority's suggestion, self-identification is not merely one way to prove the requisite connection.  It is the organizing principle that unites the majority's myriad examples.  The principle is derived directly from the STEP Act's definition of a criminal street gang as an "ongoing organization, association, or group of three or more persons, whether formal or informal . . . having a common name or common identifying sign or symbol . . . ."  (§ 186.22, subd. (f).) A gang is defined internally by its members, who then show themselves to be a group by using a common name or symbol that identifies their group and distinguishes it from others.  The same principle applies when a larger umbrella group operates through subsets.  A subset recognizes itself as both the subset and as part of the umbrella group.  It demonstrates that self-identification through its conduct.

The majority asserts that "there are some limits on the boundaries of an identity-based theory" and it would be insufficient "merely that a local subset has represented itself as an affiliate of what the prosecution asserts is a larger organization."  (Maj. opn., *ante*, at p. 20.)  The majority further suggests subsets should "mutually acknowledge one another as part of that same organization . . . ." (*Id*. at p. 19.)  The majority concludes as to self-identification:  "Evidence of self-identification must refer to the particular activities of subsets, and must permit the jury to reasonably conclude that the various subsets are associated with each other because of their shared connection with a certain group."  (*Id*. at p. 21.)

I agree that the mere subjective intent of particular subset members to identify with an umbrella group is insufficient to show the relevant connection.

4

The connection must be an objective one based on the subset's conduct. That is why the STEP Act requires proof of predicate offenses. However, I disagree with any suggestion that different subsets must acknowledge each other as part of a larger group, or that the umbrella group and a subset must somehow "mutually acknowledge" each other. A particular Norteño subset may be part of the larger umbrella group, yet lack a relationship with, or knowledge of, any other particular subset.

Detective Sample's description of the Norteño gang's structure was uncontroverted below and reflected a highly informal group.[4] Its informality does not exclude it from the reach of the statute. It would be remarkable indeed to expect a gang like that described here to operate under a set of "bylaws" or be hierarchically linked. The statute embraces criminal street gangs that differ dramatically from Murder Incorporated. Some sophisticated criminal enterprises may operate in a highly structured way, with an organizational chart and designated "shot callers." But the STEP Act does not require that any given gang do so, so long as the statutory elements are met. There need not be proof that different subsets work together, or have any particular affection for each other. This case provides no occasion for us to speculate about what other kinds of evidence might suffice in other circumstances, with gangs that operate differently.

When the proffered predicate offenses are allegedly committed by members of a subset, there must be sufficient evidence of a link between that subset and the

---

[4] As discussed, Sample's testimony was insufficient, not because it failed to adequately describe the relationship between the umbrella Norteño gang and its subsets generally, but because he failed to specifically link the particular subsets alleged to have committed the predicate offenses with the larger gang. Contrary to the majority's characterization, nothing in this opinion suggests reviewing courts should "speculate to fill evidentiary gaps . . . ." (Maj. opn., *ante*, at p. 25.) Of course they should not do so.

5

umbrella group.  The link must show the subset self-identifies as associating with the umbrella group, and demonstrates that association through its conduct.  This link can, of course, be established in a variety of ways, including statements by members or by inferences drawn from their behavior.  Because the evidence of such self-identification was lacking here, I concur with the majority's holding that the Court of Appeal's judgment must be reversed.

**CORRIGAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Prunty

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 214 Cal.App.4th 1110
**Rehearing Granted**

_____

**Opinion No.** S210234
**Date Filed:** August 27, 2015

_____

**Court:** Superior
**County:** Sacramento
**Judge:** Marjorie Koller

_____

**Counsel:**

Susan K. Shaler, under appointment by the Supreme Court, for Defendant and Appellant.

Lisa M. Romo for Pacific Juvenile Defender Center as Amicus Curiae on behalf of Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Wanda Hill Rouzan and Kevin L. Quade, Deputy Attorneys General, for Plaintiff and Respondent.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Susan K. Shaler
991 Lomas Santa Fe Drive, Suite C , #112
Solana Beach, CA  92075
(858) 259-6737

Kevin L. Quade
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 324-5291