Filed 6/30/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL RESENDEZ,<br><br>    Defendant and Appellant. | B269608<br><br>(Los Angeles County<br>Super. Ct. No. KA110015) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

## SUMMARY

Defendant Michael Resendez appeals following his jury conviction of (1) assault by means of force likely to produce great bodily injury with a gang enhancement and (2) assault with a deadly weapon. The jury also found true great bodily injury and prior prison enhancements. On appeal, defendant argues that under *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), the prosecution failed to present sufficient evidence of predicate offenses to establish the existence of a criminal street gang under the California Street Terrorism Enforcement and Prevention Act (the STEP Act, Pen. Code, § 186.20 et seq.).[1] We disagree.

*Prunty* holds that "when the prosecution seeks to prove the street gang enhancement by showing a defendant committed a felony to benefit a given gang, but establishes the commission of the required predicate offenses with evidence of crimes committed by members of the gang's alleged subsets, it must prove a connection between the gang and the subsets." (*Prunty, supra,* 62 Cal.4th at pp. 67-68.) In *Prunty*, there was no evidence of such a connection. Here, the evidence was ample. Accordingly, we affirm the judgment.

## FACTS

On February 7, 2015 in Baldwin Park, defendant attacked Eliseo A., who was traveling by bicycle from the grocery store toward home. Just before his assault on Mr. A., defendant rode his bicycle past Mr. A. and yelled, "East Side Bolen." Mr. A. replied, "What did you say?" Defendant then got off his bike, and punched Mr. A. on the left eye and back of his head. Mr. A. hit defendant twice and then took him to the ground and held him there. While on the ground, defendant kicked Mr. A. in the head

---

[1] All further statutory references are to the Penal Code.

several times, bit his left wrist, and put his fingers in Mr. A.'s left eye. Mr. A. told defendant that he was not a gang member. During the struggle, defendant said things like: "This is my varrio," "Get this bitch off me," and "Homies come help me."[2]

Police arrived and arrested defendant. While he was being transported to the hospital, defendant stated to police: "I'll fuck that fool up. This is my varrio, East Side Bolen." In prior contacts with the arresting officer, defendant had previously identified himself as an East Side Bolen gang member and, when asked, did not deny that his moniker was "Money Mike."

At trial, the victim and arresting officer testified to the events we have just described. In addition, the parties presented the following evidence.

## 1. Detective Acuna

Baldwin Park Police Detective Adam Acuna testified as an expert on criminal street gangs in Baldwin Park. He identified defendant as an East Side Bolen gang member from the Locos clique, based on prior consensual interactions Detective Acuna had had with defendant and on defendant's tattoos. The East Side Bolens had five cliques (smaller groups or subsets within the larger gang): the Locos, Rascals, Midgetcharros, Charros, and Dukes.

Detective Acuna testified that southern Hispanic gang members "are very territorial and that's what they pride themselves on is respect and territory. Being territorial is what they . . . claim, what their neighborhood is, whatever they want to claim their boundaries and respect. It's what they have." He

---

[2]   We need not provide further details of the underlying assault, because defendant's only argument on appeal is the sufficiency of the evidence of the gang allegations.

elaborated that East Side Bolen gang members "challenge any outsider that was there and because that's their territory. If they are not familiar with you, you didn't grow up there, you are not from that neighborhood, they are going to question you."

Detective Acuna testified that four rival gangs claim territory within Baldwin Park. The four gangs are East Side Bolen (defendant's gang), North Side Bolen, Kings Have Arrived, and South Side Des Madre. The boundaries of the East Side Bolen territory are, from the north, Ramona Boulevard east of the 605 Freeway; to the east, to the border with West Covina; and to the south, to Puente Avenue. There are also some factions of East Side Bolen north of Ramona Boulevard, on Los Angeles Street, Merced and Walnut, all east of the 605 Freeway.

Detective Acuna testified there are about 500 documented members of East Side Bolen (including all the cliques). This number includes those in custody, not in custody, and those who had moved out of Baldwin Park. Only a small group of about 20 members are dedicated and active, out of custody and still on the streets, and defendant was among this small group when he committed the assault in this case.

Detective Acuna described East Side Bolen's primary criminal activities, and opined that the attack on a victim like Mr. A. was committed to benefit the gang as a whole by instilling fear of the gang members in the community. This fear was intended to facilitate the commission of future crimes by gang members with impunity.

Detective Acuna also testified to the predicate felonies committed by Francisco Marin and Juan Ledezma, both of whom self-identify with the larger East Side Bolen gang in addition to the Rascals subset. Detective Acuna testified, "I have several contacts with Francisco Marin. He goes by Tiny by East Side Bolen Parque as well from the Rascals clique, which is another

4

subset within East Side Bolen. He was convicted of possession of firearm where he fought and ran from officers during this incident." Further, Detective Acuna testified, "Juan Ledezma is also an East Side Bolen Parque gang member from the Rascals clique, who goes by Sicko. He was also arrested and convicted with possession of a firearm. He participated with other East Side Bolen Parque gang members."

## 2. Additional Testimony

In addition to the expert testimony of Detective Acuna, four other witnesses testified. Joshua Patino and Carmelo Placeres, incarcerated members of the East Side Bolen gang (who are members of the Rascals and Midgetcharros subsets, respectively), agreed to be removed from prison to testify as character witnesses for defendant. Ryan Felton and Jeffrey Honeycutt, officers with the Baldwin Park Police Department, testified as rebuttal witnesses for the prosecution.

### a. Mr. Patino

Mr. Patino testified that defendant "had to pull [him] down from prison to come here for [defendant]," and that he "wanted to come for [defendant]." Mr. Patino is serving a 13-year sentence for robbery and for beating up his cellmate in prison, who he described as "a rapist." Mr. Patino, who has known defendant for about 13 years, described defendant as loyal, respectful, humble, trustworthy, reliable, and honest. Defendant gives a person, "whoever it was, total respect, either if he's a cop, a girl, guy, you know." He testified defendant "would take [his] shirt off for me," and that "I would trust you--I would leave my girl around you," to which defendant replied, "I trust you the same way, fool."

Defendant, who represented himself at trial, said during his examination of Mr. Patino that he wished he had been there when Mr. Patino beat up his cellmate in prison, and that Mr. Patino "should have got a purple heart or something."

5

Mr. Patino testified that if defendant had been there, he would have expected defendant to back him up.

### b.      Mr. Placeres

Mr. Placeres testified he is a member of the Midgetcharros clique.  He described defendant as "good hearted" and a "good person" who "looks out for folks around him, like family."  When asked by defendant to further describe his character, Mr. Placeres replied, "Respectful.  Loyal.  To those who deserve it, you know, you're an upstanding guy in I guess in our culture, you know."  Mr. Placeres described the tattoo on his own forehead that says "Bolen" as "pretty big,"  yet also testified he "know[s]" himself as from East Side Bolen Midgetcharros; "[p]retty much like in my eyes I'm a Charro and that's it."

### c.      Officer Felton

Officer Felton testified as a rebuttal witness, describing defendant's disrespectful behavior toward the police and others.

Officer Felton testified to defendant's behavior, in concert with another East Side Bolen gang member, in a park in territory claimed by their gang.  Officer Felton saw defendant with his fellow gang member, Paul Pacheco, and Mr. Pacheco's brother, "sitting there smoking, hanging out" at a picnic table with several different drugs and open beer cans spread out on the table.  Officer Felton told them all to put their hands up; none complied; he told them to have a seat; Mr. Pacheco did not comply.  Defendant told Mr. Pacheco, "Come on, we got this.  Let's fight him.  We can do this.  Fuck this guy.  He's not going to do anything."  Defendant called Officer Felton a "pussy"; said, "Take off your badge, bitch.  Let's do this right now"; and said "I'll fuck you up."  Other officers arrived.  Mr. Pacheco and defendant both tried to fight and get away from the officers.

Officer Felton also testified that he had talked with one of defendant's character witnesses, Mr. Patino, about his

6

(Mr. Patino's) gang membership, and that Mr. Patino told him "[t]hat he's an Eastsider," and "I believe he's a member of their Rascals clique."

### d.    Officer Honeycutt

Officer Honeycutt is now an undercover narcotics officer but previously was a gang officer with the Baldwin Park Police Department. He testified to an encounter he had with defendant in jail when he and other officers attempted to speak with him and complete a field information card. Defendant appeared to be under the influence, was very angry and upset, and refused to speak to them other than to yell profanities at them.

Officer Honeycutt was also familiar with both of defendant's character witnesses. He testified both men claimed membership in East Side Bolen Parque, though he was uncertain which subsets they claimed. Officer Honeycutt testified that "it's common to see somebody from the Rascals hanging out with somebody from the Locos."

The jury found defendant guilty of the substantive offenses and found true the gang and great bodily injury allegations. In a bifurcated trial, defendant admitted the prior prison term allegations. The court sentenced defendant to an aggregate term of 10 years in state prison.

Defendant filed a timely appeal.

## DISCUSSION

### 1.    Standard of Review

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the

7

judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60.)

## 2. The STEP Act and *Prunty*

### a. The background principles

The STEP Act imposes a sentencing enhancement on those who commit felonies "for the benefit of, at the direction of, or in association with any criminal street gang . . . ." (§ 186.22, subd. (b).) As *Prunty* explains, "A criminal street gang, in turn, is defined by the Act as any 'ongoing organization, association, or group of three or more persons' that shares a common name or common identifying symbol; that has as one of its 'primary activities' the commission of certain enumerated offenses; and 'whose members individually or collectively' have committed or attempted to commit certain predicate offenses." (*Prunty, supra,* 62 Cal.4th at p. 67, quoting § 186.22, subd. (f).) To prove a criminal street gang exists, "the prosecution must demonstrate that the gang satisfies the separate elements of the STEP Act's definition and that the defendant sought to benefit that particular gang when committing the underlying felony." (*Prunty,* at p. 67.)

In *Prunty,* the court concluded the STEP Act "requires the prosecution to introduce evidence showing an associational or organizational connection that unites members of a putative criminal street gang. The prosecution has significant discretion in how it proves this associational or organizational connection to exist . . . ." (*Prunty, supra,* 62 Cal.4th at p. 67.) As indicated above, when the prosecutor shows the defendant committed a felony to benefit a given gang, but establishes the necessary

8

predicate offenses were committed by members of the gang's subsets, the prosecutor "must prove a connection between the gang and the subsets." (*Id.* at pp. 67-68.)

The court offered several "illustrative examples" of strategies prosecutors may pursue to prove the necessary "associational or organizational connection." (*Prunty, supra,* 62 Cal.4th at pp. 67, 76-81.) In one example, "the facts may suggest the existence of behavior reflecting such a degree of collaboration, unity of purpose, and shared activity to support a fact finder's reasonable conclusion that a single organization, association, or group is present." (*Id.* at p. 78.) The evidence "need not be direct, and it need not show frequent communication . . . among the members who communicate. For instance, evidence that two . . . subsets have professed or exhibited loyalty to one another would be sufficient to show that the two subsets collaborate or cooperate. . . . [¶] Even evidence of more informal associations, such as proof that members of two gang subsets 'hang out together' and 'back up each other,' can help demonstrate that the subsets' members have exchanged strategic information or otherwise taken part in the kinds of common activities that imply the existence of a genuinely shared venture." (*Ibid*.)

### b. The evidence in *Prunty*

Defendant relies on *Prunty*, contending the evidence in his case "was not sufficient to demonstrate an associational or organizational connection between the Rascals subset [who committed the predicate offenses] and the larger East Side Bolen gang . . . ." As may already be apparent from our recitation of the evidence, defendant is mistaken. The circumstances in *Prunty* stand in glaring contrast to the evidence in this case.

In *Prunty*, the defendant was charged with attempted murder and assault with a firearm. To prove a gang enhancement, the prosecution introduced testimony from a gang

9

expert who had interviewed the defendant after his arrest. (*Prunty, supra,* 62 Cal.4th at p. 68.)  The expert stated that the defendant admitted he was "a 'Northerner,' or a Norteño gang member," and a member of the Detroit Boulevard Norteño " 'set,' " and testified that the defendant's clothing, previous contacts with police, and possessions were consistent with Norteño gang membership.  (*Ibid.*)  The expert described the Norteños as a Hispanic gang active in Sacramento and throughout California, with 1,500 local members.  (*Id.* at p. 69.)  He testified that "Sacramento-area Norteños are not associated with any particular 'turf' but are instead 'all over Sacramento' with 'a lot of subsets based on different neighborhoods.' "  (*Ibid.*)

As to the predicate offenses, the expert in *Prunty* testified that two Varrio Gardenland Norteños committed a variety of offenses, and that one Varrio Centro Norteño shot at a former Norteño gang member.  The expert testified that the subsets referred to themselves as Norteños.  (*Prunty, supra,* 62 Cal.4th at p. 69.)  The prosecution produced no specific evidence showing the subsets identified with a larger Norteño group; "[n]or did [the expert] testify that the Norteño subsets that committed the predicate offenses shared a connection with each other, or with any other Norteño-identified subset."  (*Ibid.*)

*Prunty* held the testimony just described was insufficient to prove "that the Sacramento-area Norteños were indeed the ones who committed the . . . predicate offenses . . . ."  (*Prunty, supra,* 62 Cal.4th at pp. 69, 82.)  "Although [the expert] characterized these groups [(the subsets who committed the predicate offenses)] as Norteños, he otherwise provided no evidence that could connect these groups to one another, or to an overarching Sacramento-area Norteño criminal street gang.  [The expert] did not describe any evidence tending to show collaboration, association, direct contact, or any other sort of relationship

10

among any of the subsets he described.  None of his testimony indicated that any of the alleged subsets had shared information, defended the same turf, had members commonly present in the same vicinity, or otherwise behaved in a manner that permitted the inference of an associational or organizational connection among the subsets." (*Id*. at p. 82.)

The court continued:  "Nor did [the expert]'s testimony demonstrate that the subsets that committed the predicate offenses, or any of their members, self-identified as members of the larger Norteño association that [the] defendant sought to benefit. . . .  [T]he prosecution presented no evidence that the members of the Varrio Gardenland and Varrio Centro Norteños self-identified as part of the umbrella Norteño gang. . . .  [[T]he expert] simply described the subsets by name, characterized them as Norteños, and testified as to the alleged predicate offenses.  He offered no additional information about their behavior or practices that could reasonably lead the jury to conclude they shared an identity with a larger group." (*Prunty, supra,* 62 Cal.4th at pp. 82-83, fn. omitted.)

The court concluded:  "[T]he evidence provided no way for the jury to determine that the Norteños were an 'organization, association, or group' under the STEP Act's meaning—or, critically, that the alleged subsets that committed the predicate offenses were part of that group." (*Prunty, supra,* 62 Cal.4th at p. 84.)

### 3.   **This Case**

Unlike *Prunty*, the record in this case provides substantial, indeed compelling, evidence of collaboration, association, and direct contact among the various subsets of the East Side Bolen Parque gang—clearly allowing the jury to infer *both* that defendant and the subset that committed the predicate offenses identified with the larger East Side Bolen gang *and* that they

11

shared connections with each other. Indeed, the contrasts between the evidence in this case and in *Prunty* are stark—both in the scope, nature and territory of the gangs and subsets at issue, and in the evidence presented of shared connections and identification with a single gang.

The first point is less significant, but illuminates the evidentiary differences between the two cases: the East Side Bolen gang and its subsets bear no similarity to the Sacramento-area Norteño gang and its subsets.

In contrast with *Prunty*'s 1,500 Norteños spread " 'all over Sacramento' " and with " 'a lot of subsets based on different neighborhoods' " (*Prunty, supra,* 62 Cal.4th at p. 69), in this case there are only 500 documented members of East Side Bolen—including those in prison and those who have moved out of the city. And there were only 20 active members when defendant was arrested. Unlike the Norteños, who are not associated with any particular turf in the Sacramento area, the East Side Bolen gang claims a well-defined territory within the city of Baldwin Park – which is also home to three other, rival gangs. While the record does not contain statistics for comparison, it is scarcely open to doubt that the East Side Bolen gang's defined territory within Baldwin Park is substantially smaller than the area that is home to the "Sacramento-area Norteños." (*Prunty, supra,* 62 Cal.4th at p. 69.) And unlike the Norteños, Detective Acuna testified in this case that southern Hispanic gangs in general, and East Side Bolen in particular, are "very territorial."

In short, this is a case where a gang, East Side Bolen, with 20 active members not in custody, and with five subsets, claims a well-defined area within a relatively small city also plagued by three rival gangs. This alone at least suggests the likelihood of collaboration among the subsets and identification by those

12

subsets with East Side Bolen.  But there is, as we have seen, much more.

The second and critical difference between *Prunty* and this case is that the prosecution in *Prunty* provided *no* evidence of a connection between the defendant's gang and the subsets that committed the predicate offenses.  (*Prunty, supra,* 62 Cal.4th at pp. 69, 82.)  In contrast, here there was testimony showing contacts among the Locos (defendant's subset) and Rascals (subset of the perpetrators of the predicate offenses), and showing they all self-identified with the East Side Bolen gang.

Officer Honeycutt testified that it is common to see members of the Rascals subset hanging out with members of the Locos subset.  Juan Ledezma, perpetrator of one of the predicate crimes, committed that crime in concert with other East Side Bolen gangsters.  Detective Acuna testified that Mr. Ledezma and Mr. Marin, the perpetrators of the predicate crimes, both self-identified with East Side Bolen as well as with the Rascals subset.  Mr. Patino, who Officer Felton identified as a member of the Rascals subset, and Mr. Placeres, who testified to membership in the Midgetcharros subset, agreed to be removed from prison to testify as character witnesses for defendant.  Officer Honeycutt testified he is familiar with both of them and knows they both claim membership in East Side Bolen.

Indeed, it is difficult to conceive of more powerful, *direct* evidence of a long-term relationship of trust and collaboration between members of different subsets of East Side Bolen than is found in the testimony of Mr. Patino and Mr. Placeres.  Clearly, defendant communicated and worked together with Mr. Patino and Mr. Placeres to arrange for them to be transported from prison to testify in his defense.  Mr. Patino described defendant as someone who would take off his shirt for Mr. Patino, and who Mr. Patino would trust with his girlfriend.  Defendant said

during his examination of Mr. Patino that he wished he had been with Mr. Patino in prison when he assaulted his cellmate, and that Mr. Patino deserved a Purple Heart for his crime. In turn, Mr. Patino testified he would have expected defendant to back him up if he had been there during the attack on Mr. Patino's cellmate.

Both Mr. Patino and Mr. Placeres specifically used the word "loyal" to describe defendant. Notably, Mr. Placeres had the word "Bolen" tattooed in large letters on his forehead, yet he testified that he thinks of himself only as a member of the Midgetcharros subset. Despite declaring self-identity only with the Charros, Mr. Placeres agreed to be removed from prison to help his Locos associate beat an assault conviction. (Mr. Patino and defendant also took the opportunity to promote the interests of their gang in court by bragging about and congratulating one another for the beating of a cell mate who they believed deserved retribution, and by declaring their desire to cover one another's backs.)

In short, could there possibly be any more direct evidence that members of different subsets "professed" and "exhibited loyalty to one another"? (*Prunty, supra,* 62 Cal.4th at p. 78 [evidence that two subsets "have professed or exhibited loyalty to one another would be sufficient to show that the two subsets collaborate or cooperate"]; *ibid.* ["proof that members of two gang subsets 'hang out together' and 'back up each other,' can help demonstrate that the subsets' members have exchanged strategic information or otherwise taken part in the kinds of common activities that imply the existence of a genuinely shared venture. [Citations.] This type of evidence routinely appears in gang enhancement cases."]; *id.* at pp. 78-79 ["In general, evidence that shows subset members have communicated, worked together, or share a relationship (however formal or informal) will permit the

jury to infer that the subsets should be treated as a single street gang."].)

We could go on, but the point is clear. *Prunty* tells us that "[e]vidence—even indirect evidence—showing collaboration among subset members, long-term relationships among members of different subsets, use of the same 'turf,' behavior demonstrating a shared identity with one another or with a larger organization, and similar proof will show that individual subsets are part of a larger group . . . ." (*Prunty, supra,* 62 Cal.4th at pp. 73-74.) In this case, there was direct evidence of all of that.

In sum, defendant in this case was one of 20 East Side Bolen members who actively promoted his gang and protected its turf when he committed the assault in this case. He acted alone when he committed the assault in the name of East Side Bolen, but he and fellow East Side Bolen associates made themselves highly visible to the police and civilians in Baldwin Park. Defendant had extremely close ties with Mr. Patino, a member of the Rascals subset, which subset committed the two predicate felonies. He also commanded the respect and loyalty of Mr. Placeres, a member of the Midgetcharros subset. Officer Honeycutt testified that both Mr. Patino and Mr. Placeres claim membership in East Side Bolen. Detective Acuna testified that the perpetrators of the predicate crimes, Francisco Marin and Juan Ledezma, both self-identify with East Side Bolen. Unlike the facts in *Prunty*, there is substantial evidence from which the jury could infer that defendant committed the assault for the benefit of East Side Bolen and all its subsets.

## DISPOSITION

The judgment is affirmed.

GRIMES, J.

WE CONCUR:

RUBIN, Acting P. J.

FLIER, J.

.