Filed 2/10/22  P. v. Lopez CA2/7
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JANETH LOPEZ et al.,<br><br>    Defendants and Appellants. | B271516<br><br>(Los Angeles County<br>Super. Ct. No. BA404685) |

APPEALS from judgments of the Superior Court of Los Angeles County, Curtis B. Rappé, Judge.  Reversed with directions.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant Janeth Lopez.

Janyce Keiko Imata Blair, under appointment by the Court of Appeal, for Defendant and Appellant Ivy Navarrete.

Xavier Becerra, Rob Bonta, Attorneys General, Gerald A. Engler, Lance E. Winters, Chief Assistant Attorneys General,

Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Michael R. Johnsen, Scott A. Taryle, Supervising Attorneys General, Amanda V. Lopez and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

——————————

An act of vandalism—spraying graffiti on a church wall—ended with one person dead and a second wounded. The shooter, Pedro Martinez, was convicted of first degree murder and attempted willful, deliberate and premeditated murder. Janeth Lopez, who had marked the church wall with spray paint, and Ivy Navarrete, who drove Martinez and Lopez away from the church after the shooting, were convicted of second degree murder, attempted willful, deliberate and premeditated murder and felony vandalism. Lopez and Navarrete appealed, challenging the propriety of their convictions under the natural and probable consequences doctrine and the sufficiency of the evidence to support the jury's finding their crimes had been committed to benefit a criminal street gang.

While Lopez's and Navarrete's appeals were pending before this court and the Supreme Court, the Legislature substantially modified the law relating to accomplice liability for murder and attempted murder. Senate Bill No. 1437 (Stats. 2018, ch. 1015) (Senate Bill 1437) eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Gentile* (2020) 10 Cal.5th 830, 842-843) and significantly narrowed the felony-murder exception to the malice requirement for murder. (See Pen. Code, §§ 188, subd. (a)(3), 189, subd. (e);[1] *People v. Lewis* (2021) 11 Cal.5th 952, 957.)

---

[1] Statutory references are to this code.

Senate Bill No. 775 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 551, § 2) (Senate Bill 775), effective January 1, 2022, expanded the reach of that ameliorative legislation to include convictions for attempted murder and voluntary manslaughter and provided a defendant convicted under a now invalid theory of murder or attempted murder may seek relief on direct appeal in lieu of the section 1170.95 postjudgment petition process created by Senate Bill 1437. In addition, Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699, § 3) (Assembly Bill 333), effective January 1, 2022, increased the proof requirements for imposition of a criminal street gang enhancement, modifying the definitions of "criminal street gang" and "pattern of criminal gang activity" and clarifying the evidence needed to establish an offense benefits, promotes, furthers or assists a criminal street gang.[2]

The sole theory advanced by the People at Lopez and Navarrete's second trial was that murder and attempted murder were the natural and probable consequences of the target crime of misdemeanor vandalism (graffiti). In light of Senate Bill 1437 and Senate Bill 775 we reverse the murder and attempted murder convictions and remand the case for retrial of those counts under a legally viable theory or resentencing. In addition, because it elevated their remaining conviction for vandalism from a misdemeanor to a felony,[3] the jury's finding that the vandalism

---

[2] The definitional changes made by Assembly Bill 333 also apply to requirements for proving the crime of actively participating in a criminal street gang. (§ 186.22, subd. (a).)

[3] Misdemeanor vandalism may be treated as a felony pursuant to section 186.22, subdivision (d), if committed for the benefit of a criminal street gang.

at the church was committed for the benefit of a criminal street gang is reversed and that count is remanded to give the People an opportunity to meet their burden of proof under Assembly Bill 333's new requirements.

**FACTUAL BACKGROUND**

1. *The Shooting*

In the early evening of November 4, 2012 Hipolito Acosta, Santos Baquiax and Andres Ordonez were in the back parking lot of a church at the corner of Beverly Boulevard and Reno Street in Los Angeles, preparing food for members of the congregation. When they heard the sound of shattering glass from the street, Acosta went to investigate. He saw Lopez spray painting graffiti on the wall of the church and asked what she was doing. Lopez replied, "Fuck off," and ran at Acosta, hitting him on the arm with the spray paint can. Lopez knocked Acosta to the ground and kicked him, all the while yelling at him.

As Lopez was attacking Acosta, Baquiax and Ordonez came out from the parking lot. When Baquiax was about six feet from Acosta, and Ordonez about 12 feet away, Lopez ran to a BMW parked in front of the church. Acosta saw her throw the spray paint can on the ground.

As Lopez ran back to the BMW, Martinez got out of the back seat of the car and fired three or four shots in the direction of Baquiax and Ordonez. One bullet hit Baquiax in the shoulder, and he fell to the ground. Another bullet struck Ordonez in the chest; he managed to walk back to the parking lot, where he collapsed. Ordonez died from the bullet wound to his chest.

Martinez returned to the BMW. Baquiax saw someone in the driver's seat but could not tell if it was a man or a woman. The BMW drove away.

4

2. *The Investigation*

Officers from the Los Angeles Police Department arrived at the scene shortly after the shootings. They recovered three shells, which had been fired from a semiautomatic weapon, from the sidewalk and found a spray paint can by the curb. Lopez's fingerprint and DNA were on the can. The police also found a broken beer bottle in the gutter near the spray paint can. Navarrete's fingerprint and DNA were on the bottle. Graffiti found on a nearby building contained three names: "Looney," "Wicked" and "Ivy." It also had the words, "Fuck Tampax."

On November 7, 2012 Baquiax identified Lopez from a photographic lineup as the woman he saw hitting Acosta. Baquiax also identified Martinez from a photographic lineup as the shooter. On November 8, 2012 Acosta also identified Lopez from a photographic lineup. He was not certain of his identification but thought she "could be the one."

Officers arrested Lopez at her home a few miles from the crime scene on November 8, 2012. The following day Navarrete's home was searched. The officers found a letter Lopez sent to Navarrete in 2008 that referred to "Rockwood" and was signed "from Looney." Officers also found a photograph of Lopez and Navarrete together; Lopez was making a Rockwood Street gang hand symbol.

At the time of the church shooting Navarrete had been living with Sonia Vallejo. Vallejo's stepson and Navarrete had a child together. According to Vallejo, Navarrete and Lopez were close friends and spent weekends together. Navarrete, who drove a grey BMW, provided transportation for Lopez, who did not have a car. Navarrete also talked to someone named Pedro or Peter.

On the day of the shooting, Friday, November 4, 2012, Navarrete told Vallejo she was going to be with Lopez. Navarrete returned home Sunday night. Several days later Navarrete was gone, leaving her child and all her belongings at Vallejo's home. Navarrete and Martinez were found and detained in Mexico in February 2013.

The police examined cell phones belonging to Lopez, Navarrete and Martinez. Lopez's contacts included Navarrete and Martinez. Navarrete and Martinez had exchanged text messages; Martinez had made calls to Lopez. On the evening of November 6, 2012 all three cell phones had been in the same general area near Lopez's home and near the scene of the shooting.

3. *Gang Evidence*

Los Angeles Police Officer Antonio Hernandez testified Rockwood Street was a criminal street gang that had started in the early 1980's. In November 2012 it had about 180 members, including 20 active members. (Officer Hernandez defined active members as members who were not incarcerated.) The gang had its own territory, symbols and hand signs. The gang's primary activities included murder, robbery, assault and extortion. Rockwood Street members were convicted of murder in 2007 and 2008.

Rockwood Street had subsets or cliques based on location, two of which were Westmoreland and K.T.O. Members of these two cliques got along with one another and engaged in joint activities.

According to Officer Hernandez, the Temple Street gang had been Rockwood Street's enemy since 2003; and members of the two gangs tried to eliminate or kill each other. Rockwood

Street members used "Tampax" as a derogatory term for Temple Street members. The areas where the shootings took place and the additional graffiti was discovered were in Temple Street territory.

Officer Hernandez knew Lopez to be a Rockwood Street member in the K.T.O. clique with the moniker "Looney" and believed Martinez was a Rockwood Street member in the Westmoreland clique with the gang monikers "Rabbit" and "Wicked." He opined that Navarrete was a Rockwood Street associate based on his previous contact with her, the fact her boyfriend, Martinez, was a gang member and the 2008 letter Lopez had written to Navarrete discussing Rockwood Street.

Officer Hernandez explained that tagging crews use graffiti as art, while gang members use graffiti to mark their territory. Territory is very important to gang members, and infiltrating another gang's territory is an aggressive sign of disrespect. Putting up graffiti in a rival gang's territory would boost a gang member's respect within his or her own gang. However, a gang member engaging in this activity could expect members of the rival gang to react with violence, including assault with a deadly weapon or murder, if caught in the act. For this reason, a gang member putting up graffiti in rival territory would often go with a group that might include a getaway driver and a shooter in case there was a violent confrontation.

## PROCEDURAL BACKGROUND

1. *The First Trial*

On July 15, 2013 Lopez, Navarrete and Martinez were charged by information with the murder of Ordonez (§ 187, subd. (a); count 1); attempted willful, deliberate and premeditated murder of Baquiax (§§ 187, subd. (a), 664; count 2)

7

and Acosta (count 3); and misdemeanor vandalism—graffiti—with damage under $400 (§ 594, subd. (a); count 4). The information included firearm-use and criminal street gang enhancement allegations and also alleged Navarrete and Martinez each had a prior conviction for a violent or serious felony within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12).

At the initial trial in the case, the jury convicted Martinez of first degree murder, one count of attempted premeditated murder (Baquiax) and vandalism and found true the firearm-use and criminal street gang enhancement allegations. It was unable to reach a verdict as to the second count of attempted murder (Acosta).[4]

The jury convicted Lopez and Navarrete of vandalism and found true the criminal street gang allegation. It was unable to reach a verdict as to the remaining charges, and the trial court declared a mistrial as to those counts.

2. *The Second Trial and Sentencing*

When the case was called for retrial on November 9, 2015, on the People's motion the trial court dismissed the count alleging Acosta's attempted murder. The jury then convicted Lopez and Navarrete of second degree murder and attempted willful, deliberate and premeditated murder. It found true the special allegations a principal had personally and intentionally discharged a firearm in the commission of the crimes, causing great bodily injury and death, and the crimes were committed for the benefit of a criminal street gang.

---

[4] We affirmed Martinez's convictions in 2016. (*People v. Martinez* (Dec. 12, 2016, B262799) [nonpub. opn.].)

The trial court sentenced Lopez to an aggregate indeterminate state prison term of 40 years to life: 15 years to life for second degree murder, plus 25 years to life for the firearm-use enhancement on that count; and a concurrent term of life for attempted premeditated murder with a minimum parole eligibility of 15 years based on the criminal street gang enhancement, plus 25 years to life for the firearm-use enhancement on that count. The court also imposed and stayed 10-year criminal street gang enhancements on those two counts and imposed and stayed a two-year term for vandalism, which became punishable as a felony because of the gang enhancement.

The court sentenced Navarrete to an aggregate indeterminate state prison term of 60 years to life: 15 years to life for second degree murder, doubled for the prior strike, plus 25 years to life for the firearm-use enhancement on that count, plus five years for a prior serious felony conviction; and a concurrent term of life imprisonment for attempted premeditated murder, with a minimum parole eligibility of 30 years, plus 25 years to life for the firearm-use enhancement on that count, plus five years for the prior serious felony conviction. As with Lopez, the court also imposed and stayed 10-year criminal street gang enhancements on those two counts and imposed and stayed a two-year felony term for vandalism.

3. *The First Appeal and the Supreme Court's Transfer for Reconsideration*

In a nonpublished opinion filed in August 2017 we rejected Lopez's and Navarrete's challenges to the propriety of their convictions for murder and attempted murder under the natural and probable consequences doctrine and to the sufficiency of the evidence to support the finding the crimes had been committed to

9

benefit a criminal street gang, affirmed the judgment as modified to correct several sentencing errors[5] and remanded as to Lopez for further proceedings pursuant to *People v. Franklin* (2016) 63 Cal.4th 261.

Lopez's and Navarrete's petitions for review were granted by the Supreme Court in November 2017, but further action was deferred pending consideration of a related issue in *People v. Mateo*, review granted May 13, 2016, S232674, transferred to court of appeal March 15, 2019—whether, to convict an aider and abettor of attempted premeditated murder under the natural and probable consequences doctrine, both premeditation and attempted murder must have been reasonably foreseeable by an individual committing the target offense. Before that case was decided, however, the Legislature enacted Senate Bill 1437. The Supreme Court then transferred Lopez and Navarrete's case to us with directions to vacate our decision and to reconsider it in light of Senate Bill 1437, as well as other new legislation that authorized the trial court to strike or dismiss certain previously mandatory firearm enhancements.

4. *The Second Appeal and the Supreme Court's Transfer for Reconsideration*

In a decision filed August 21, 2019, without affirming or reversing Lopez's and Navarrete's convictions for second degree

---

[5] The trial court had erred in including in Navarrete's sentence five-year enhancements for a prior serious felony (§ 667, subd. (a)(1)) because that enhancement had not been pleaded and proved. It also erred in imposing both the firearm-use and criminal street gang enhancements (although the gang enhancements were stayed) as part of Lopez's and Navarrete's sentences for murder and attempted murder.

murder, we remanded the matter to the superior court to provide an opportunity for them to petition pursuant to newly enacted section 1170.95 to vacate those convictions. However, we again affirmed their convictions for attempted premeditated murder (and the related firearm-use and criminal street gang enhancements), rejecting their statutory and constitutional arguments that Senate Bill 1437 precluded a conviction for attempted murder under the natural and probable consequences doctrine. We remanded for the trial court not only to consider the section 1170.95 petitions but also to correct several sentencing errors, to exercise its discretion whether to dismiss or strike the firearm-use enhancement imposed on the attempted murder counts and to conduct further proceedings pursuant to *People v. Franklin*, *supra*, 63 Cal.4th 261 for Lopez.

On November 13, 2019 the Supreme Court again granted Lopez's and Navarrete's petitions for review, limiting the issues to be considered to whether Senate Bill 1437 applied to attempted murder liability under the natural and probable consequences doctrine and whether, to convict an aider and abettor of attempted willful, deliberate and premeditated murder under the natural and probable consequences doctrine, an unsuccessful premeditated murder must have been a natural and probable consequence of the target offense. (*People v. Lopez*, S258175.) In October 2021 the Supreme Court directed the parties to file supplemental briefs on the significance, if any, of Senate Bill 775 to the issues presented in the case. On November 10, 2021 the Court transferred the matter to this court, with directions to vacate our August 21, 2019 decision and to reconsider the cause in light of Senate Bill 775.

11

After the Supreme Court's transfer, Lopez, Navarrete and the Attorney General filed supplemental briefs addressing the impact of Senate Bill 775 on Lopez's and Navarrete's murder and attempted murder convictions. We then requested the parties file additional supplemental briefs directed to the effect, if any, of Assembly Bill 333 on the criminal street gang enhancement found true by the jury as to the vandalism conviction.

**DISCUSSION**

1. *Senate Bills 1437 and 775 Require Reversal of the Convictions for Murder and Attempted Murder*

As discussed, Senate Bill 1437 eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of first or second degree murder. (*People v. Gentile*, *supra*, 10 Cal.5th at pp. 842-843.) In addition to substantively amending sections 188 and 189, Senate Bill 1437 added section 1170.95, which provides a procedure for individuals convicted of murder who could not be convicted under the law as amended to retroactively seek relief. (See *People v. Lewis*, *supra*, 11 Cal.5th at p. 959; *Gentile*, at p. 843.) The ameliorative provisions of Senate Bill 1437 as enacted, however, did not apply on direct appeal to convictions, like Lopez's and Navarrete's, that were not yet final before the law became effective. (*Gentile*, at p. 852.) "Such convictions may be challenged on Senate Bill 1437 grounds only through a petition filed in the sentencing court under section 1170.95." (*Ibid*.)

As amended by Senate Bill 775 section 1170.95, subdivision (a), now provides, "A person convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime,

12

*attempted murder under the natural and probable consequences doctrine*, or manslaughter may file a petition with the court that sentenced the petitioner to have the petitioner's murder, attempted murder, or manslaughter conviction vacated and to be resentenced on any remaining counts . . . ." (Italics added.)[6] In addition, new subdivision (g) of section 1170.95[7] authorizes a defendant on direct appeal to challenge his or her conviction based on the new limits on accomplice liability for homicide: "A person convicted of murder, attempted murder, or manslaughter whose conviction is not final may challenge on direct appeal the validity of that conviction based on the changes made to Sections 188 and 189 by Senate Bill 1437."

As the Attorney General acknowledges in his first supplemental brief, Lopez's and Navarrete's convictions for second degree murder and attempted willful, deliberate and premeditated murder were based solely on the natural and probable consequences doctrine. That is, the People argued at trial it was to be anticipated that conspiring to place gang graffiti in a rival gang's territory (the target offense of vandalism) could lead to a violent confrontation that included the use of firearms by one of the coconspirators (the nontarget offenses of murder and attempted murder), and Lopez and Navarrete's jury was

---

[6] In an uncodified statement of its intent in enacting Senate Bill 775, the Legislature declared the legislation "[c]larifies that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories."

[7] Former subdivision (g) of section 1170.95 was redesignated subdivision (h).

instructed with CALCRIM Nos. 416 and 417 that a coconspirator is liable for crimes that are the natural and probable consequence of the common plan or design of the conspiracy.  While proper at the time of trial, that theory of accomplice/coconspirator liability is no longer valid.  Because their convictions for murder and attempted murder are not yet final—Lopez's and Navarrete's direct appeals have been pending since April 2016—and were based on instructions incorporating a now invalid legal theory, they must be reversed.  (See *People v. Aledamat* (2019) 8 Cal.5th 1, 3 [conviction that may have been predicated on erroneous or invalid legal theory must be reversed unless, based on all the circumstances, the reviewing court determines the error was harmless beyond a reasonable doubt]; *People v. Chiu* (2014) 59 Cal.4th 155, 168 [same].)

Although no alternate theory of liability for murder and attempted murder was proffered at trial, because we reverse those convictions due to a retroactive change in the law, not insufficient evidence, retrial remains theoretically possible if the People believe the evidence would support a conviction on a viable legal theory.  (See *People v. Chiu, supra*, 59 Cal.4th at p. 168 [allowing the People to retry charge of first degree murder on a direct aiding and abetting theory when jury may have improperly based prior verdict on natural and probable consequences doctrine]; see also *People v. Gutierrez* (2018) 20 Cal.App.5th 847, 857 [permitting new trial on charge of unauthorized taking of an automobile when evidence of value of automobile not introduced at original trial and Supreme Court had not yet ruled on Proposition 47's applicability to Vehicle Code section 10851]; *People v. Figueroa* (1993) 20 Cal.App.4th 65, 71-72, fn. 2 [permitting new trial where statutory amendments

added new element to offense after original trial].)  Accordingly, we remand the case to allow the People to elect whether to retry Lopez and Navarrete (or either of them) as direct aiders and abettors of the murder of Ordonez and the attempted murder of Baquiax or to proceed to resentencing consistent with this opinion.

2. *Substantial Evidence Supported the Jury's Criminal Street Gang Findings but Reversal of Those Findings Is Necessary in Light of Assembly Bill 333's New Proof Requirements*

In their original briefing in the case, Lopez and Navarrete challenged the jury's findings they committed the crimes for the benefit of a criminal street gang, arguing the People had failed to prove the gang members who had committed the predicate offenses were members of the same gang subset as Lopez and Navarrete, as required by *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), and the evidence on which the gang expert relied was not competent under *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).  In supplemental briefing they argue, and the Attorney General concedes, the prosecution's evidence at their trial did not satisfy several of the new requirements for proving a criminal street gang enhancement imposed by Assembly Bill 333.

We agree the gang finding must be reversed in light of Assembly Bill 333's new requirements for proving predicate offenses and a pattern of criminal gang activity.  However, because, as we concluded twice before, neither of the original challenges to the sufficiency of the evidence for the gang findings has merit, retrial of the enhancement is not barred; and the People should have the opportunity to meet their burden of proof under section 186.22 as amended by Assembly Bill 333.  (See

*People v. Eagle* (2016) 246 Cal.App.4th 275, 280 ["When a statutory amendment adds an additional element to an offense, the prosecution must be afforded the opportunity to establish the additional element upon remand.  [Citation.]  Such a retrial is not barred by the double jeopardy clause or ex post facto principles"]; *People v. Figueroa*, *supra*, 20 Cal.App.4th at pp. 71-72, fn. 2.)

       a.  Prunty

    To obtain a true finding on an allegation of a criminal street gang enhancement, the People must prove the crime at issue was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1).)  At the time of Lopez and Navarrete's trial, a "criminal street gang" was defined as an organization that had as one of its primary activities the commission of one or more of the crimes enumerated in section 186.22, subdivision (e), and whose members had engaged in a "pattern of criminal gang activity" by committing two or more of such predicate offenses on separate occasions or by two or more persons within a three-year period.  (§ 186.22, subds. (e), (f); *People v. Valencia* (2021) 11 Cal.5th 818, 829; *People v. Loeun* (1997) 17 Cal.4th 1, 9.)

    In *Prunty* the defendant argued the People failed to introduce sufficient evidence to prove that he had committed the underlying offenses for the benefit of a criminal street gang, challenging the prosecution's theory the relevant ongoing organization, association or group was the gang known as the Norteños in general.  (*Prunty*, *supra*, 62 Cal.4th at p. 70.)  Specifically, the defendant contended "the prosecution's use of crimes committed by various Norteño subsets to prove the

16

existence of a single Norteño organization . . . improperly conflated multiple separate street gangs into a single Norteño gang without evidence of 'collaborative activities or collective organizational structure' to warrant treating those subsets as a single entity." (*Ibid*.)

The Supreme Court agreed, holding, "[W]here the prosecution's case positing the existence of a single 'criminal street gang' for purposes of section 186.22(f) turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets. That connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together. And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization." (*Prunty*, *supra*, 62 Cal.4th at p. 71; see *id*. at p. 81 ["the prosecution must show that the group the defendant acted to benefit, the group that committed the predicate offenses, and the group whose primary activities are introduced, is one and the same"].)

Officer Hernandez testified the Rockwood Street gang had subsets or cliques that included Westmoreland and K.T.O. Members of the separate cliques of Rockwood were all members of the same gang and were simply divided by location. The various cliques used common gang symbols and hand signs, and

17

it was common for members of two cliques to conduct joint activities.

Officer Hernandez also testified the gang's primary activities were murder, attempted murder, robbery and extortion. Richard Alvarez, a Rockwood Street member known as Shaggy or Shadow, was convicted of a murder committed in 2007. Rodrigo Bernal, a Rockwood Street member known as Scooby or Woody, was convicted of a murder committed in 2008.

The trial court asked Officer Hernandez specifically whether there was "some kind of associational connection" between the Westmoreland and K.T.O. sets, noting that "[s]ome gangs with actual subsets could actually be rivals, correct?" Hernandez agreed that was the case "[f]or some," but "[i]n Rockwood they're—none of the cliques are against each other at all." The court then asked, "So what I want to know is what's the associational relationship between these two different cliques as well as others of Rockwood?" Hernandez responded, "As far as like the Westmorelands since that block is—nobody really hangs out there. Those that are from Westmoreland come over here to hang out with the cliques on our side of the . . . Rampart Division." In response to further questioning, he explained that Westmoreland and K.T.O. had their own hierarchies, but they were part of the common organization, not completely separate.

The court also asked Officer Hernandez, "How does that organizational composition interact?" The officer answered, "Well, they all hang out together. The people that we have suspected of being in charge of running that clique don't always come out and talk to us but we are told and from information we've gathered that they do hang out and they do conduct their business all as one."

Lopez and Navarrete contended in their original briefing that this evidence was not sufficient for the jury to find the required associational or organizational connections among Rockwood Street, Westmoreland and K.T.O. Additionally, they argued the People's evidence of primary activities and predicate crimes did not prove the specified murders had been committed as part of criminal gang activity because there was no evidence as to the subsets, if any, to which the perpetrators (Bernal and Alvarez) belonged and, thus, no way to link the Westmoreland and K.T.O. subsets to the Rockwood gang.

A comparison of the gang evidence in this case and that in *Prunty* demonstrates the flaw in Lopez and Navarrete's original argument. In *Prunty* the defendant was an admitted member of the Detroit Boulevard Norteño set. (*Prunty*, *supra*, 62 Cal.4th at p. 68.) The gang expert "testified that the Norteños are 'a Hispanic street gang active in Sacramento and throughout California' with about 1,500 local members." (*Id*. at p. 69.) The "Sacramento-area Norteños are not associated with any particular 'turf' but are instead 'all over Sacramento' with 'a lot of subsets based on different neighborhoods.'" (*Ibid*.) The expert also described the primary activities of Sacramento-area Norteños and the common names, signs, symbols and color of the Norteños. (*Ibid*.) The expert identified the Norteños' enemy as the Sureño street gang, which had its own letters, number and color. (*Ibid*.) He explained that "[b]oth the Norteños and the Sureños 'originated out of the California prison systems' in the 1960s and 1970s. The Sureños are associated with the Mexican Mafia prison gang, while the Norteños have a 'street gang association' with the Nuestra Familia, or NF, prison gang." (*Ibid*.)

The gang expert in *Prunty* "described a 2007 confrontation between two Norteño gang subsets, the Varrio Gardenland Norteños and the Del Paso Heights Norteños, that led to two Varrio Gardenland members' convictions for a variety of offenses, including murder and attempted murder. [He also] testified about a 2010 incident in which members of the Varrio Centro Norteños shot at a former Norteño gang member. Besides [the expert's] testimony that these gang subsets referred to themselves as Norteños, the prosecution did not introduce specific evidence showing these subsets identified with a larger Norteño group. Nor did [the expert] testify that the Norteño subsets that committed the predicate offenses shared a connection with each other, or with any other Norteño-identified subset." (*Prunty*, *supra*, 62 Cal.4th at p. 69.)

The Supreme Court found that "where the prosecution's evidence fell short is with respect to the predicate offenses. [The expert] referred to two offenses involving three alleged Norteño subsets . . . . Although [the expert] characterized these groups as Norteños, he otherwise provided no evidence that could connect these groups to one another, or to an overarching Sacramento-area Norteño criminal street gang." (*Prunty*, *supra*, 62 Cal.4th at p. 82.) In addition, the expert's testimony did not "demonstrate that the subsets that committed the predicate offenses, or any of their members, self-identified as members of the larger Norteño association that the defendant sought to benefit. Although there was ample evidence that [the defendant] self-identified as both a member of the Detroit Boulevard Norteños and the larger umbrella Norteño gang, and that he collaborated with a member of another subset to commit his present offenses, the prosecution presented no evidence that the members of the Varrio

20

Gardenland and Varrio Centro Norteños self-identified as part of the umbrella Norteño gang." (*Id*. at pp. 82-83.)

Here, in contrast, Officer Hernandez's testimony established Rockwood Street had a relatively small number of members and a discrete territory. The cliques were not separate entities, but acted as parts of a common organization whose members spent significant amounts of time with one another. Thus, the jury had evidence from which it could reasonably find that acts by members of any particular subset of Rockwood Street were intended to benefit the larger gang itself. (See *Prunty*, *supra*, 62 Cal.4th at p. 83 [the prosecution needed to present evidence from which the jury could "connect the subsets that committed the predicate offenses to the larger Norteño group the prosecution claimed [the defendant] acted to benefit"]; *People v. Resendez* (2017) 13 Cal.App.5th 181, 191 ["the prosecution in *Prunty* provided *no* evidence of a connection between the defendant's gang and the subsets that committed the predicate offenses. [Citation.] In contrast, here there was testimony showing contacts among the Locos (defendant's subset) and Rascals (subset of the perpetrators of the predicate offenses), and showing they all self-identified with the East Side Bolen gang"]; *People v. Garcia* (2017) 9 Cal.App.5th 364, 378 ["there is a plethora of evidence in the record that the Bittys and the Jungles subsets self-identified as part of the Black P-Stones and 'mutually acknowledge[d] one another as part of that same organization'"].) The acts of Alvarez and Bernal, no matter what subset of Rockwood Street they may have belonged to, were predicate acts of members of the same criminal street gang Lopez and Navarrete sought to benefit.

### b. Sanchez

As a further challenge to the sufficiency of the evidence to support the predicate-acts element of the criminal street gang findings, Lopez and Navarrete in their original briefing argued Officer Hernandez's opinion regarding the association between the subsets and the Rockwood gang conveyed to the jury case-specific hearsay evidence prohibited by the Supreme Court's decision in *Sanchez, supra*, 63 Cal.4th 665, which held a gang expert may not "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id*. at p. 686.)[8]

In *Sanchez* the expert had based his opinion the defendant was a member of a certain gang on various police contacts during which the defendant was in the company of members of that gang, and on statements he made when given a "STEP notice" informing him he was associating with a known gang. (*Sanchez, supra*, 63 Cal.4th at pp. 672-673.) The expert admitted he had never met the defendant, was not present when the STEP notice was given or during any of the police contacts, and his knowledge

---

[8] Trial in this case took place before the Supreme Court issued its decision in *Sanchez*, which disapproved the Court's earlier decision, *People v. Gardeley* (1996) 14 Cal.4th 605, "to the extent it suggested an expert may properly testify regarding case-specific out-of-court statements without satisfying hearsay rules." (*Sanchez, supra*, 63 Cal.4th at p. 686, fn. 13.) In *People v. Perez* (2020) 9 Cal.5th 1, 9 the Court held a claim of error from the admission of *Sanchez* hearsay was not forfeited by a defendant's failure to object at a trial that occurred prior to the issuance of *Sanchez*.

of these matters was derived from police reports and a field identification card. (*Id*. at p. 673.) As the Court explained in finding these statements had been improperly admitted, "Any expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion rests. . . . There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception. [¶] What an expert *cannot* do is relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Sanchez*, at pp. 685-686; see *People v. Valencia*, *supra*, 11 Cal.5th at p. 831 [an expert generally is not permitted to supply case-specific facts about which he has no personal knowledge but "'may testify about more generalized information[, even if derived from hearsay,] to help jurors understand the significance of those case-specific facts. An expert is also allowed to give an opinion about what those facts may mean'"].)

Here, Lopez and Navarrete tacitly conceded the propriety of Officer Hernandez's testimony that Lopez was a Rockwood Street member and Navarrete an associate, the evidence at issue in *Sanchez*, but argued his opinion the Westmoreland and K.T.O. subsets were associated with, and part of, the Rockwood gang presented inadmissible case-specific hearsay without independent supporting proof. They also contended

23

Officer Hernandez's testimony Alvarez and Bernal were Rockwood gang members was inadmissible under *Sanchez*.

Lopez and Navarrete misperceive the nature of Officer Hernandez's testimony concerning the subsets of the Rockwood gang. "In addition to matters within their own personal knowledge, experts may relate information acquired through their training and experience, even though that information may have been derived from conversations with others, lectures, study of learned treatises, etc." (*Sanchez, supra*, 63 Cal.4th at p. 675; accord, *People v. Valencia, supra*, 11 Cal.5th at p. 831.) That is exactly what Hernandez did here, opining about the relationship of the Westmoreland and K.T.O. subsets to the Rockwood gang based on his training and experience without repeating any specific statements from third parties regarding the operation and organization of the Rockwood gang. (See *Valencia*, at p. 838 ["[G]eneral testimony about a gang's behavior, history, territory, and general operations is usually admissible. [Citation.] The same is true of the gang's name, symbols, and colors. All this background information can be admitted through an expert's testimony, even if hearsay, if there is evidence that it is considered reliable and accurate by experts on the gang"].)

As for Alvarez's and Bernal's gang membership, in *People v. Valencia, supra*, 11 Cal.5th 818, decided while Lopez and Navarrete's second petitions for review were pending, the Supreme Court, resolving a split among courts of appeal, held the particular facts concerning predicate offenses necessary to establish "a pattern of criminal gang activity" within the meaning of section 186.22, subdivision (f), "must be proven by independently admissible evidence" and "may not be established solely by testimony of an expert who has no personal knowledge

24

of facts otherwise necessary to satisfy the prosecutor's burden." (*Valencia*, at p. 826.) However, the Court also held, "A gang expert may still render an opinion regarding the gang membership of the perpetrator of a predicate offense in response to a proper hypothetical question based on premises established by competent evidence." (*Id.* at p. 839.) Here, the record reflects Officer Hernandez's testimony regarding Alvarez and Bernal was based on personal knowledge—he had testified at both men's trials for what was identified here as the gang's predicate offenses—and the certified minute orders from those cases. This evidence was sufficient to support a finding as to the predicate offenses.

### c. *Assembly Bill 333*

Assembly Bill 333 made a number of significant modifications to the requirements for proving a criminal street gang enhancement:

- Previously section 186.22, subdivision (f), defined a "criminal street gang" as "any ongoing organization, association or group of three or more persons, whether formal or informal . . . ." A "criminal street gang" is now defined as "an ongoing, organized association or group of three or more persons, whether formal or informal . . . ."

- Subdivision (f)'s definition previously required proof that gang members "individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." It now provides that element must be proved by evidence that gang members "collectively engage in, or have engaged in, a pattern of criminal gang activity," eliminating individual engagement.

25

- Section 186.22, subdivision (e)'s definition of "pattern of criminal gang activity," previously required proof of two or more of the identified predicate offenses, "provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." As amended, subdivision (e) requires proof that (i) the last offense used to show the pattern of criminal gang activity occurred within three years of the date the currently charged offense is alleged to have been committed; (ii) the offenses were committed on separate occasions or by two or more gang members, rather than simply "persons"; (iii) the offenses commonly benefited a criminal street gang, and the common benefit was more than reputational; and (iv) the currently charged offense cannot be used to establish the pattern.
- Amended subdivision (e) also limits the qualifying predicate offense that can be used to establish a pattern of criminal gang activity, removing vandalism, looting and a number of fraud-related offenses from the list.
- New section 186.22, subdivision (g), provides "to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational." The new subdivision provides as examples of a common benefit that is more than reputational "financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or

26

> intimidation or silencing of a potential current or previous witness or informant."

In addition to these definitional changes, Assembly Bill 333 added section 1109, which requires, if requested by the defendant, that a gang enhancement charged under section 186.22, subdivision (b), be tried separately from, and after, determination of the defendant's guilt of the underlying offense. (§ 1109, subd. (a); Stats. 2021, ch. 699, § 5.)[9]

The evidence presented at Lopez and Navarrete's trial failed to satisfy the requirements of section 186.22, subdivision (b), as amended by Assembly Bill 333. Although those amendments do not alter the punishment imposed for a true finding on a gang enhancement, because they increase the threshold for imposition of the enhancement, under the principles articulated in *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, *People v. Brown* (2012) 54 Cal.4th 314, 323, and *In re Estrada* (1965) 63 Cal.2d 740, these amendments are to be applied retroactively to nonfinal judgments. (See *People v. Nasalga* (1996) 12 Cal.4th 784, 792 ["[t]he rule in *Estrada* has been applied to statutes governing penalty enhancements, as well as to statutes governing substantive offenses"]; *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301 [statutory amendments that

---

[9]     New section 1109, subdivision (b), provides a gang participation charge under section 186.22, subdivision (a), must be tried separately from all other counts that do not otherwise require gang evidence as an element of the crime.

27

benefit a defendant by redefining conduct subject to criminal sanction are to applied to cases pending on appeal].)[10]

First, Officer Hernandez testified to two murders by Rockwood Street gang members as predicate offenses that were committed in 2007 and 2008, more than three years before the vandalism of the church. Second, because it was not relevant at the time, there was no evidence those murders benefited the gang, let alone that the benefit was more than reputational, and no evidence the members of the Rockwood Street gang collectively, rather than individually, engaged in the predicate offenses that formed the pattern of criminal gang activity. Third, Officer Hernandez testified the benefit to the gang of the current offenses (the vandalism and the ensuing shooting) was reputational, which is no longer sufficient for imposition of the gang enhancement. Accordingly, we reverse the true finding on the criminal street gang enhancements and remand to provide the People an opportunity to meet their new burden of proof.

---

[10] The Attorney General agrees Assembly Bill 333's changes to the definitions of the elements of the criminal street gang enhancement apply retroactively to Lopez and Navarrete's case. In his supplemental brief, however, he states new section 1109, requiring a separate proceeding to try gang enhancements, may apply prospectively only. Because our remand will provide the opportunity for a separate proceeding if the People elect to retry the gang enhancement, we need not address this issue.

## DISPOSITION

The judgment and Lopez's and Navarrete's convictions for second degree murder and attempted willful, deliberate and premeditated murder are reversed. Their conviction for vandalism is affirmed but the related true finding on the criminal street gang enhancement is reversed. The cause is remanded to provide the People an opportunity to retry Lopez and Navarrete or either of them on a legally viable theory of murder and attempted murder and to retry the criminal street gang enhancement. If the People elect not to do so, Lopez and Navarrete are to be resentenced in a manner that is consistent with this opinion.

PERLUSS, P. J.

We concur:

SEGAL, J.

FEUER, J.